**DELOACH vs. JONES Et Al.**

APPEAL FROM THE COMMERCIAL COURT OF NEW ORLEANS.

EASTERN DIS.
*May*, 1841.

DELOACH
*vs.*
JONES ET AL.

18L 447
49  480

A Bank, authorized to discount, as an incident to lending money may take security: so also it may lend money on the faith of a cotton crop; and cause the cotton to be shipped by an agent to be sold, to reimburse the loan, without violating its charter.

Where, in a common law state, a party pledges his cotton crop for a certain sum advanced to him, and the pledgee is authorized and required to sell the cotton for reimbursemont: *Held*, that as a pledge, it was *defeasible before delivery*, but *afterwards*, the contract was complete.

Delivery is essential to the validity of a contract of pledge in a common law state; and even a parol argreement followed by delivery is legal and binding on the parties and third persons.

In a case of pledge or bailment of goods or personal property, without limitation of time for redemption, the creditor may call on the creditor to redeem after his debt is due, by having a judicial sale, under a decree of foreclosure or upon giving reasonable notice to the debtor to redeem. But the parties may stipulate as to the *time* and *mode* of sale.

So a contract, partaking of the features both of a pledge and of an assignment in trust to secure the payment of a debt, is valid in a common law state.

So where cotton is pledged to secure the payment of a loan of money, and delivered to the agent of the creditor, making the advance, who ships it to be sold for the purpose of paying this loan, it is not liable to an attaching creditor in the hands of the consignee who is made garnishee.

This suit commenced by attachment. The plaintiff residing in Tennessee, filed his affidavit the 11th April, 1840, and on the 13th his petition, alleging the defendant residing in Arkansas, was indebted to him in the sum of $2,500, which he had to pay as endorser, the 12th April, 1837. He prayed judgment for this sum and for an attachment against the property of said defendant in the hands of Lee & Co., whom he cited as garnishees, and propounded interrogatories. They admitted they had 208 bales of cotton, made on the plantation of the defendant, but which had been marked E. B. and shipped and consigned to them by E. Britton, cashier of the Real Estate Bank of Arkansas, as its agent, and to be sold for and on its account. This cotton was attached.

The Bank of Arkansas now intervened; claiming the cotton under a written pledge and delivery to its agent.

There was judgment for the plaintiff against the defendant for the amount of his claim; and in favor of the intervention on the part of the Bank. The plaintiff appealed.

*Anderson & Elwyn*, for the plaintiff.

*Culbertson*, for the defendant.

*P. W. Farrar & Vason*, for the intervening party, insisted that this case presented the following facts:

1. That at the time of the levying the attachment there was an existing and unliquidated debt due from Jones to the Bank.

2. That of the existence of that debt the attaching party had notice as well as of the transfer and *delivery* by Jones of the 208 bales of cotton to the Bank.

3. That by the laws of the State of Arkansas, we have a lien upon this cotton to the amount of Jones's debt to the Bank.

4. That the attaching creditor in this State cannot be prefered to the Bank of Arkansas to whom this cotton was transfered before it reached the city of New-Orleans.

5. That Jones had divested himself (as by the law of Arkansas he had a right to do,) of any property in the 208 bales of cotton subject to this attachment.

6. That the cotton was at the time of the levying of the attachment in the hands of the consignee of the Bank, and that the property, legal right and control of the same was in the Bank.

*Simon, J.* delivered the opinion of the court.

In this case, an attachment was issued at the suit of a resident of the State of Tennessee, against a citizen of the State of Arkansas. Thomas B. Lee & Co. of the city of New-Orleans were made garnishees, and answered the interrogatories propounded to them by the plaintiff, as follows: 1st. that they did receive 208 bales of cotton marked E. B. per steamer Campté. 2d. That they believe the cotton was made in the

State of Arkansas, and was shipped, as the annexed bill of
lading shows, by E. Britton. 3d. (after objecting to answer this interrogatory) they state that they believe that said cotton
was made on defendant's plantation; that the Real Estate Bank of the State of Arkansas, at Washington in said State, owns said cotton, and that the same belongs to said bank: and 4th. That T. B. Lee & Co. have the proceeds of said cotton in their control, and that it is sufficient to pay the claim of the plaintiff as set forth in his petition.

On the first of May, 1840, the President and Directors of the Branch of the Real Estate Bank of the State of Arkansas at Washington, intervened and alleged· that the attachment in this suit having been sued out against the property of Isaac N. Jones, was levied upon the proceeds of 208 bales of cotton in the hands of T. B. Lee & Co. by making them garnishees. That said cotton was shipped by the intervenors' agent E. Britton, for their use and benefit, and consigned to the house of Lee & Co. by said Britton (they refer to the bill of lading) to secure the payment of a draft drawn by Jones on said Lee & Co. for $10201, payable at the New-Orleans Canal and Banking Company, due 3d of March, 1840, belonging to the intervenors, and that the proceeds of said cotton belongs to the intervenors, in virtue of the delivery to and possession of said cotton by their said agent for the purpose of applying the same to the payment of the draft; and that according to the laws of Arkansas, where the cotton was delivered, they are entitled to the said proceeds and have a right to apply the same to the payment of said draft by privilege and in preference to plaintiff's claim. They pray accordingly.—Plaintiff answered the petition of intervention, by pleading the general issue, and denying specially the intervenor's alleged privilege or lien on the property attached.—There was judgment below in favor of the plaintiff against the defendant for $2,500, and in favor of the intervenors for the proceeds of the cotton attached; and the plaintiff, after having vainly attempted to obtain a new trial, took the present appeal.

The facts of the case, are merely these : plaintiff as the surety of the defendant, paid a debt of his to the amount of $2,500, balance due on a note of hand payable on the 12th of August, 1837.—In August, 1839, the defendant, whose property was under seizure, made application for assistance to the Real Estate Bank of Arkansas, and obtained *the advance of a certain sum* of money, ($9,658) to pay the seizing creditor, whereupon the defendant executed the following instrument ; "Whereas the Real Estate Bank of the State of Arkansas, at the Branch thereof at Washington, Arkansas, has this day advanced and paid over to me the sum of *nine thousand six hundred and fifty-eight dollars*, and in order to secure the prompt, early and punctual payment thereof to said Bank, I have granted, bargained and sold, and by these presents do grant, bargain and sell unto the said Real Estate Bank all of my crop of cotton raised by me at my plantation in Lost Prairie, Lafayette county, Arkansas; and I hereby agree with said Bank, and bind and obligate myself to pick, gin and bale said cotton crop at the earliest possible day, and mark the same in the name of Edwin Britton, (who is the mutual agent of myself and said Bank in the premises,) and deliver the same to said Britton on the bank of Red River, opposite to my plantation in Lost Prairie, Lafayette county, Arkansas; and the said Britton is to ship the same at my expense and charges to New-Orleans, to the commission house of Thomas B. Lee & Co., of the city of New-Orleans, and by them sold, and the proceeds thereof to be paid over by the said T. B. Lee & Co. to the said Edwin Britton agent as aforesaid, and by him applied to the payment of the said sum of $9,658 aforesaid, and the residue, if any, to be paid over by said Bank to me. In witness whereof, I have hereunto set my hand and seal, this 28th of August, 1839. (Signed) Isaac N. Jones." Britton was the cashier of the Bank. On the day after said instrument was executed, as a means of repaying the sum advanced, Jones made his draft in favor of Wilson & Paup on T. B. Lee & Co. for $10,201, payable at six months, at the New-Orleans

Canal and Banking Company, (the amount of said draft, in- <span style="float:right">Eastern Dis.</span>
terest off, being the sum so advanced by the bank of Arkansas) <span style="float:right">*May,* 1841.</span>
which draft was endorsed by the said Wilson & Paup and by <span style="float:right">DELOACH</span>
Jones himself.   In pursuance of the said agreement, about <span style="float:right">*vs.*<br>JONES ET AL.</span>
two or three weeks previous to the shipment, the cotton crop,
(208 bales) were placed by Jones on the bank of Red River,
marked with the initials E. B.   The cashier was about the
same time informed by Jones that said cotton was so placed
there ready for shipment, and accordingly on the 5th of March
1840, said cashier, *as accredited agent of the bank,* shipped
the same for the specific purpose of paying the sum advanced.
The bill of lading shows that the 208 bales of cotton were
shipped by and in the name of Edwin Britton and consigned
to T. B. Lee & Co.   These facts are corroborated by the tes-
timony of other witnesses and by the answers of the garnishees
to the plaintiff's interrogatories.   There is also evidence from
which it may be strongly inferred that the plaintiff knew and
approved of the arrangement between the defendant and the
Bank of Arkansas some time before the cotton was shipped;
that he was aware of the application of Jones to the bank, and
of the assignment of the crop of cotton for the purpose of re-
imbursing the amount of the sum advanced; that he said he
was pleased the bank had raised the money for Jones; and
that one or two days previous to the attachment, plaintiff was
apprized by T. B. Lee that he had received the cotton, and
was directed by the cashier of the bank to pay the proceeds
into the Canal Bank.

The first objection made to the intervenors' right of reco-
very is that the bank had no power or authority to enter into
such contract by the laws of the State of Arkansas.   The
charter of the Real Estate Bank of Arkansas is not before us,
but it has been admitted that it was duly and legally incorpo-
rated by the legislature of said State; if so, as a bank, the
institution has undoubtedly the power to loan money, and it is
conceded, that, as an incident thereto, it had the power to take
security.   It is contended however that the bank could not

A bank, au-
thorized to dis-
count, as an
incident to lend-
ing money may
take security: so
also it may lend
money on the
faith of a cotton
crop; and cause
the cotton to be
shipped by an
agent to be sold,
to reimburse
the loan, with-
out violating its
charter.

EASTERN DIS. bind itself to the obligations of conveying cotton to market,
May, 1841. and to act in the capacity of carriers: This objection, it seems
DELOACH to us is untenable: the appellant's counsel appears to con-
vs.
JONES ET AL. found the means with the object. The object of the contract
was not to convey the cotton to market, but to have it sold
after delivery to apply the proceeds thereof to the satisfaction
of the debt which it was intended to secure ; the bank was not
to derive any profit from the transportation of the cotton, it
was to be shipped in the name of their cashier and agent, as
their property, and consigned for the purposes mentioned in
the contract ; and the conveying of the cotton to New-Orleans,
was only the means through which the bank was to obtain the
full and complete execution of the contract. Under the ad-
mission that it was *duly incorporated*, and in the absence of
their charter, the intervenors, as a corporation, must be pre-
sumed to have all the rights and powers as are daily exercised
by all the banking institutions of the country; they may make
valid contracts, obligate others and obligate themselves towards
others, manage their own affairs, exercise their rights, &c.;
and we are not ready to say that purchasing or advancing
money upon cotton, or any other kind of property, or taking
cotton in payment of or as security for their loans, subject to
its being sold to be realized in money, should be considered as
a violation of the rights and privileges generally granted to
such corporations; nay, it is of public notoriety that certain
banking institutions have for years been engaged in this kind
of business ; and unless it be prohibited by their charters, we
can see no reason why they should not be allowed to do so for
the furtherance of their interest, and particularly to afford them
the means of securing their debts and of getting the reim-
bursement of their funds.

But, it is urged that the cashier had no authority to contract
for the bank: the terms of the contract show clearly that it
was made for the sole benefit of the bank, and for the purpose
of securing a sum of money loaned by and due to the institu-
tion ; the proceeds of the cotton are to be paid over to the

bank, and when the cashier acted as the agent of said bank, the only consequence was that, if he had acted *without authority*, the institution might perhaps have been allowed to disavow and repudiate his acts; but here, instead of doing so, the intervention, which is in the name of the President and Directors, shows conclusively that they consider the act of their Cashier as their own, that they recognize him as their agent, and that the stipulations contained in the contract were made for their benefit and with their approbation. It must consequently have the same force and effect as if it had been entered into under a special authorization or power of attorney. Moreover, the contract under consideration, does not create any new obligation on the part of the bank, the money had already been loaned, before and independent of the said contract, the object of which, on the part of Jones, was merely to secure its reimbursement out of the proceeds of his crop.

EASTERN DIS.
*May,* 1841.

DELOACH
*vs.*
JONES ET AL.

Our next inquiry is with regard to the legal effect of the contract and of the delivery of the cotton, under the laws of Arkansas: it is admitted on all hands that the contract in question is neither a sale nor a mortgage. From its features, it appears to us to be in the nature of a pledge, with this difference however that here the pledgee was authorized and required to sell the cotton pledged. This is not an unusual stipulation of common law pledges; before delivery, it was defeasible, but after delivery, the contract became complete, and its effect could not be destroyed by any act of the debtor or by any subsequent proceedings of the pledgor's creditors. It is one of those contracts which are daily resorted to for the convenience of commerce, and which take their effect only from the delivery of the property transferred or pledged for the security of the debt. *Delivery is essential* to its validity; and Mr. Pike, a member of the bar of the State of Arkansas, states in his testimony, that he understands the law of said State to be that even a parol agreement or contract for such a purpose, followed up with a delivery or transfer of the property is legal and binding on the parties thereto; and on third persons.

Where, in a common law state, a party pledges his cotton crop for a certain sum advanced to him, and the pledgee is authorized and required to sell the cotton for reimbursement: *Held,* that as a pledgee, it was defeasible before *delivery,* but *afterwards,* the contract was complete.

Delivery is essential to the validity of a contract of pledge in a common law state; and even a parol agreement followed by delivery is legal and binding on the parties and third persons.

DELOACH
*vs.*
JONES ET AL.

In a case of pledge or bailment of goods or personal property, without limitation of time for redemption, the creditor may call on the debtor to redeem after his debt is due, by having a judicial sale, under a decree of foreclosure or upon giving reasonable notice to the debtor to redeem. But the parties, may stipulate as to the *time* and *mode* of sale.

So a contract, partaking of the features both of a pledge and of an assignment in trust to secure the payment of a debt, is valid in a common law state.

persons; and entitles such creditor to be paid by preference out of such property to any subsequent attaching creditor of said debtor, if transfered for a *bona fide* debt.

One of the material distinctions between *a pledge* and a mortgage, is: that a pledge is a deposit of goods redeemable on certain terms, and either with or without a fixed period for redemption. 4, *Kent's comm.*, 132. A pledge is defined to be a bailment or *delivery of goods by a debtor to his creditor*, to be kept till the debt be discharged. 2, *Kent*, 449; *Story on bailment, No.* 286. Where no time is limited for the redemption, the creditor may call upon the pledgor to redeem, and this, under the common law, he may do, after the debt is due, by having a judicial sale under a decree of foreclosure, or he may sell without judicial process upon giving reasonable notice to the debtor to redeem. 2, *Kent*, 452; *Story, p.* 207, *sec.* 308, 310.—In the present case, the pledgor may be fairly considered as having waived his right to notice by his consenting that the cotton should be sold to satisfy the debt for which it had been pledged, and by thus limiting his right of redemption to his paying the debt previous to the sale of the cotton. *Story, sec.* 317, says: "In speaking of sales by the pawnee, it has been assumed that there is no special agreement between the parties, *as to the time or mode of sale*, existing, nor any stipulation wholly interdicting any sale. If such an agreement should exist, *it must ordinarily regulate the rights of both parties;* and neither of them will be allowed to depart from it with impunity." This shows clearly that the parties, may, *by a special agreement* stipulate as to the time and mode of sale, that such an agreement must then regulate their rights, and that it is only in the absence of any such agreement, that the pledgee has to resort to the election of the two remedies pointed out by law to obtain satisfaction of his debt by a judicial sale under a decree of foreclosure or by a sale made after notice given to the debtor to redeem. We agree with the appellees' counsel that the contract under consideration partakes both of the features and character of a pledge and of an assignment in trust,

which, as Mr. Pike says, are two of the three modes known to the common law, for securing the payment of debts; and as it has not been shown to be such as to be prohibited by or in contravention of the laws of the state of Arkansas, where the common law prevails, we are disposed to give to it the force and effect which the parties intended it should have, not only at the time of its execution, but more particularly at the time of the delivery of the cotton. This delivery is satisfactorily established by the evidence; no fraud is alleged against it; it is clear that Jones himself could not take back the property without paying the debt; and as the cotton was so delivered and consigned for the purpose of paying a specific debt; the intervenors had thereby acquired upon it, within the knowledge of the plaintiff, such a lien as to entitle them to be paid by preference out of the proceeds thereof. The plaintiff had therefore no right to attach said proceeds, further than the residue, if any, that might remain in favor of the defendant. The principles recognized in the case of *Hepp vs. Glover*, 15 *La. Rep.*, 465, are fully applicable to the present case.

It is therefore ordered, adjudged and decreed that the judgment of the Commercial Court be affirmed with costs.

EASTERN DIS.
May, 1841.

