## No. 12,280.

### STATE NATIONAL BANK VS. BRYANT & MATHERS.

1. A warehouseman who had received cotton on deposit from a factor issued his warehouse receipt for the same, deliverable to the depositor, or his order, only on surrender of the certificate. The factor, who had deposited the cotton in his own name in the warehouse, pledged the warehouse receipt to one of his own creditors. Certain parties claimed a portion of the property in the hands of the depository, alleging that the factor was without authority to pledge the cotton. The warehouseman called on the person who had made the deposit and the holders of the warehouse receipt that they might oppose the restitution, and judgment was rendered contradictorily between these parties, ordering the depository to surrender the cotton to the claimants. *Held:* That the delivery by the warehouseman to the claimants, under the judgment, protected him against any liability to the pledgee of the warehouse receipt. C. C. 2934.

2. A warehouseman issued a warehouse receipt for two hundred and twenty-five bales of cotton then actually in his warehouse, but without specification on the receipt of the particular bales of cotton received, deliverable only on surrender of the receipt, endorsed by the original holder. The depositor pledged this receipt to one of his creditors by endorsement of the receipt, and the pledgee gave immediate notice of the pledge to the warehouseman. The depositor, subsequently, deposited other cotton in the same warehouse, receiving a receipt for the same, also without designating the particular cotton covered by it. He then died. At the time of his death only seventy bales remained in the hands of the warehouseman, the balance having been delivered, under orders of court, to parties who had successfully claimed ownership and possession thereof. In a contest (for the balance of the cotton on hand) between the pledgee of the warehouse receipt and the administrator of the succession of the depositor—*Held:* that the former was entitled to recover the cotton. Cutters vs. Baker, 2 An. 572; Williams vs. Pinor, 10 An. 277; Cammach vs. Floyd, 10 An. 351; Connery vs. Webb, 12 An. 272; Newton vs. Gray, 10 An. 67.

APPEAL from the Civil Judicial District Court for the Parish of Orleans. *Théard, J.*

*James McConnell* for Plaintiff, Appellant.

*Farrar, Leake & Lemle* and *Chrétien & Suthon* for Public Administrator, Appellee:

The estate of Marx being insolvent the Public Administrator represents the creditors, and was a third person *quoad* the State National Bank.

No valid pledge has been proved as against the Public Administrator, who is a third person, he representing the creditors of S. E. Marx, his estate being insolvent. 14 An. 375; 15 An. 165; 32 An. 586; 31 An. 865; Art. 3158, Revised Civil Code.

Where the possession of the pledgor is not sufficiently complete to prevent substitution, the pledge is not valid. 46 An. 1046; 96 U. S. 476.

*E. W. Huntington* and *H. L. Dufour* for Defendants, Appellees.

Argued and submitted December 5, 1896.
Opinion handed down January 4, 1897.
Rehearing refused February 1, 1897.

## STATEMENT OF THE CASE.

Plaintiff alleges " that on the 12th day of January, 1894, Simon E. Marx, then a cotton factor in good commercial standing in this city, applied to the State National Bank for and obtained a loan of eight thousand dollars, giving as collateral security five negotiable warehouse receipts issued by the Louisiana Cotton Press, Bryant & Mathers, proprietors."

" These receipts were dated on the *11th* day of January, 1894, and certified that the Louisiana Cotton Press had received from S. E. Marx (in the aggregate) two-hundred and twenty-five bales of cotton in their warehouse, marked as per margin ("marks various") " to be delivered upon return of this receipt properly endorsed."

" The word 'negotiable' was stamped by Bryant & Mathers, in red ink, across the face of each certificate before they were issued. That these facts determined the commercial value of these certificates as collaterals, and rendered absolute the condition expressed on the face of the receipt, that the number of bales specified in each receipt would be " delivered only upon the return of the receipt properly endorsed."

"The bank made this loan applied for by Mr. Marx solely on the credit of these five certificates. A pledge note, in the form usual in the banks, was then executed, in which the two hundred and twenty-five bales of cotton called for by the five receipts were pledged, and notice was on the same day sent to Bryant & Mathers that the bank held in pledge the five receipts, specifying the numbers and amounts. Ten days later, to-wit, on the 22d of January, 1894, Mr. Marx died. On the day after Marx' death a meeting of

the board of directors of the bank was called and the matter was submitted to them for action, and apprehending that legal complications with the estate of Marx might arise from delay, the board adopted a resolution authorizing Mr. John M. Parker to demand, receive and sell the cotton." *

" On the 23d of January, at 3 o'clock P. M., Mr. John M. Parker proceeded to the Louisiana press, tendered the five certificates duly endorsed by S. E. Marx, and demanded the two hundred and twenty-five bales of cotton. To this demand the first reply of Mr. Mathers was that " as no marks were specified on these warehouse receipts, they did not know which cotton to deliver us," and subsequently a positive refusal was given."

" The refusal to deliver was made on the 23d, and the *first seizure* by any party claiming the cotton was not made until the 26th—*three days after the refusal.*"

---

*Copy of note and act of pledge annexed to plaintiff's petition:

" NEW ORLEANS, January 12, 1894.

" On demand after date, I promise to pay to the State National Bank of New Orleans, or to the order of its cashier, at the banking house of said bank, in United States notes, National Bank notes or gold coin, eight thousand dollars, for value received, with interest at the rate ot 7 per cent. per annum after date until paid. To secure this obligation to said bank and any other liabilities to said bank now existing or which may hereafter arise, I do hereby pledge to said State National Bank or its assigns, as collateral security for said note and other liabilities (225) two hundred and twenty-five bales cotton in Louisiana Press, and agree to give additional security to keep up the present margin whenever the market value of the above collateral should decline. And in the event of failure to make good such margin within twenty-four hours after notice so to do, or in the event of prompt payment of this note, according to its tenor, said bank or its president or cashier is hereby authorized to sell or cause to be sold, without the intervention of courts of justice, and without notice to me or the public, at public or private sale, at its or his option, all or any part of said collaterals, applying the net proceeds first to the payment of expenses incurred by said sale, to the discharge in part or whole of this note, any surplus to be applied at the option of the bank or its officers to the payment of any of my liabilities to said bank now existing, or which may hereafter arise. In case of deficiency I promise to pay said bank the amount thereof forthwith after such sale, with 8 per cent. interest. I hereby also agree that on failure to comply and pay said obligation as hereinabove stipulated, I shall by the mere act of said failure be adjudged to be in default without any demand or notice whatsoever. In case of a sale of collaterals, said State National Bank or the holder of any liability hereby secured may become the purchaser thereof without any right of redemption on my part.
" (Signed)                                      SIMON E. MARX."

The five warehouse receipts referred to are identical in form, all bearing date January 11, 1894. Four of them are receipts (each) for fifty bales of cotton, while the fifth is a receipt for twenty-five bales.

The following is a copy of one of the first four:

<table>
<tr><td>" Marks</td><td colspan="2">No. 499. N. O., January 11, 1894.</td></tr>
<tr><td>and</td><td colspan="2">Received from Simon E. Marx,</td></tr>
<tr><td>number</td><td colspan="2">in our warehouse, fifty (50)</td></tr>
<tr><td>of bales</td><td colspan="2">bales cotton marked as per m ɪrgin,</td></tr>
<tr><td>various</td><td colspan="2">to be delivered only upon the return of</td></tr>
<tr><td>50</td><td colspan="2">this receipt properly endorsed.</td></tr>
<tr><td>bales.</td><td>(Signed)</td><td>Louisiana Cotton Press,<br>".BRYANT & MATHERS.</td></tr>
</table>

" Endorsement on back of receipt
" (Signed)                                      SIMON E. MARX."

"Bryant & Mathers, having refused to comply with the obligation of their certificates, which was to deliver two hundred and twenty-five bales of cotton on return of the receipts properly endorsed, the bank brought suit to recover the damages sustained by their refusal."

The answer of defendants sets up:

1. That in the course of business, Simon E. Marx at various times stored various lots of cotton in their press, and for the cotton so stored they issued at his request cotton press receipts certifying that they held a certain number of bales of cotton of various marks stored in their press by Marx.

2. That these receipts were similar in form and purport to those customarily issued by the various cotton presses of this city, and negotiated by the various banks, and particularly to those issued by the Louisiana Press to Simon E. Marx, and negotiated by the State National Bank.

3. That there were receipts outstanding for two hundred and seventy-five bales of cotton of various marks stored by Simon E. Marx, and there were two hundred and seventy-five bales of cotton to represent the same in defendants' press under defendants' control at the time of the issuance of said receipts, where they still are, with the exception of such bales as have been taken from defendants by judicial process in various suits to which the plaintiff bank was made a party, and in which it appeared.

4. That defendants were simply the custodians of the cotton, responsible in law for its retention until the receipts issued for the same were returned for cancellation, or the property was taken from them by judicial process, and they were not in law or justice guarantors of the title of Marx to the cotton.

5. That they admitted a demand was made by John M. Parker & Co. in behalf of the State National Bank, on January 23, 1894, for two hundred and twenty-five bales of cotton, and a tender was made by him of the five cotton press receipts sued on, but they denied that they refused to deliver any cotton.

6. That they averred the truth to be as follows: That they informed said Parker that they held in their press and under their control a number of bales of cotton, sufficient to cover all the cotton press receipts issued by them to Marx, but as Marx had not set aside a specific number of bales of special marks for each receipt, and

there being no description of marks as usually given in such cases, accompanying the order for delivery and the receipts, defendants were without information as to the subject, and unable to point out what cotton was covered by the receipts, but offered to deliver said cotton when pointed out and identified by said State National Bank and said Parker.

7. That the fact was notorious and must have been known to plaintiff when said warehouse receipts were endorsed to them, that generally cotton factors in this city are not the owners of cotton stored by them in the presses of this city.

8. That by proper inquiry, plaintiff would have ascertained that Marx was not the owner of the cotton represented by the press receipts issued to him by Bryant & Mathers, and had no interest therein which authorized him to pledge same.

9. That plaintiff could have protected itself under the law providing for the issuance of cotton press receipts, by requiring before effecting a loan to him from Marx, proof of the ownership of the property pledged, and if any loss has fallen on said plaintiff, it was due to its failure to take the proper and prudent precautions in the premises.

10. That at no time during the life of Marx was any demand made by the bank to designate the specific marks of, or set aside the specific bales covered by each of the press receipts held by it, and had plaintiff made such a demand, defendants could have called on Simon E. Marx to designate and set aside the cotton covered by each receipt.

The succession of Simon E. Marx, the holder of a receipt for fifty bales of cotton of the two hundred and seventy-five bales stored at the Louisiana Press by him, and remaining there at the time of his death, was made a party to the suit, and answered by setting up the illegality of the pledge of the receipts to the plaintiff bank, and claiming the cotton.

There was judgment rejecting plaintiff's demand, and from that judgment this appeal has been taken.

---

The opinion of the court was delivered by

NICHOLLS, C. J. The defendants in this case are the proprietors of the Louisiana Press in the city of New Orleans, in which parties are

in the habit of storing cotton for a consideration. Among their customers was one Simon E. Marx, who, during the season of 1893 and 1894, stored several thousands of bales in their warehouse. Marx died on the 22d of January, 1894. At the time of his death the State National Bank, plaintiffs herein, were the holders of the five receipts, signed by the defendants, which they annexed to their petition; in which they acknowledged that they had received from Marx two hundred and twenty-five bales of cotton, to be delivered only upon the return of the receipts properly endorsed, while the succession of Marx held a similar receipt for fifty bales. After Marx's death, plaintiffs made a demand upon the defendants to deliver to them two hundred and twenty-five bales of cotton, notifying them that if they did not do so they would hold them responsible for the value of he same. *The bank, immediately upon receiving the receipts, had notified defendants that they were the holders of the same under Marx' endorsement.* Defendants having failed to deliver, for the reasons assigned by them in their answer to plaintiffs' supplemental petition, the present suit was instituted. From the evidence it would appear that the cotton presses in New Orleans very frequently hold, for some length of time, cotton in store for their customers without issuing directly to them receipts for the same at all; that when they are called on so to do, the storer determines the wording of the receipts as well as the number of bales for which receipts are to be issued. The usual form of the receipt is that shown by this record, in which the marks upon the bales are referred to simply as being "various," modified, when requested so to do, by entering on the margin of the receipts the special marks which were on the articles stored at the time of storage. It frequently happens that outstanding receipts having been brought in and surrendered, new receipts are given either for a larger or smaller number of bales than those originally receipted for. It results from the facts above stated that the dates of the receipts do not fix with certainty the date of actual receipt of the different lots of cotton covered by them, nor do the outstanding receipts show, necessarily, the full quantity of cotton on storage at the date of their issuance. They do, however, recognize that the press has on storage for account of the storer, at the dates of these receipts, a number of bales equal to those receipted for. The custom in New Orleans seems to have been to deliver cotton from the presses, not by force of the surren-

der of the receipts themselves, duly endorsed, but only when supplemented by a direct order from the storer accompanying the receipts on which the particular bales to be delivered were designated for the purpose of identification by the special marks upon them. The practice which has grown up, of leaving a portion of the stock in the warehouse entirely uncovered by receipts, while other portions are receipted for by receipts, in some instances specifying the precise marks upon the bales, and in others reciting in respect to the marks simply that they were " various," seems to have been adopted to give more freedom of action to storers in their commercial transactions than they would have if each lot of cotton was immediately receipted for as received by a receipt identifying the particular lot received by its special marks. The idea prevailing among the cotton press proprietors is, that so long as the outstanding receipts issued by them calls for only a given number of bales of cotton without specification of marks, their whole obligation consists in retaining in their hands a number of bales corresponding to that mentioned without regard to what particular bales are so retained—that the storer in spite of the issuing of the receipts by the press to him preserves full power of control as to the particular lots to be afterward delivered, by subsequently executing to them orders to deliver certain cotton specially designated in the order—in other words, that the holders of receipts for cotton wherein the cotton is referred to simply as cotton marked with " various " marks have but a floating or inchoate right which could attach only to the *residuum* (whatever it might be) remaining on hand after the special orders given by the storer had been exhausted, or until they themselves acquired fixed rights on an order from the storer designating specific cotton. They look upon a designation in the receipts themselves of the special marks which were upon the cotton receipted for or the subsequent designation or fixing of specific cotton by the storer in an order directed to them, coupled with a surrender of the receipt, as the exclusive means of identification of the bales falling under the operation of the receipts given, and they do not appreciate that any other condition of affairs should or could render them liable to holders of their receipts. The practice which we have alluded to is not only a very loose but a very dangerous one to all parties relying upon it. Under its operation as claimed, a factor having stored in a press several lots of cotton, part of which he could legally sell or

pledge and part of which he could not legally pledge for his own debt, can leave a part of it unreceipted for and cause to be executed to himself special receipts for a limited number of bales, leaving their identity (so far as the receipts themselves are concerned) undetermined. He can then pledge these special receipts to a bank for a loan of money, but before the particular cotton to be covered by the receipts is fixed in favor of the bank or pledgee, he can sell the cotton which he was authorized to sell or pledge to a third person, and through the instrumentality of an order directed to the press, ordering them to deliver that specific cotton to parties named, he can withdraw it from the possession of the proprietors of the warehouse, and from the possible operation of the warehouse receipts, and drive the holders of the receipts into an unsuccessful litigation with the owners of the cotton still on hand (C. C. 1921, 1922). The lenders, in the end, will find themselves, unless, under exceptional circumstances, the holders of worthless pieces of paper. Even if matters in some given case did not go to the full extent here supposed, the lenders, under the operation of this loose practice, might be driven, in execution of their collaterals, upon a worthless grade of cotton; whereas, had they taken the simple precaution of causing the marks of specific cotton to be inserted in the receipts, they would have been amply protected. So long as business men elect to deal in this way, in order, by affording commercial facilities to their customers, to retain their business, they must not be surprised that they should occasionally be called upon to suffer loss.

The proprietors of warehouses, in following this same course of dealing, are also taking upon themselves risks which they evidently underrate. It is not essentially necessary to a liability on their part for cotton receipted for by them, either that the marks upon certain specific cotton should be inserted in the receipts, nor that the storer should by subsequent special order directed to them designate the particular cotton to be covered by their receipt. A certain condition of facts *dehors* the receipts themselves and *dehors* the direct order of the storer might, as between themselves and the holder of their receipts, fix a liability upon them. (*Id certum est*. C. C. 1917, 1918). We do not propose to enter into an examination of cases of possible responsibility on their part. One of the witnesses on the stand (Mr. Heyward) a cotton press

proprietor, showed that he realized a very probable danger in a case supposed by himself. He said that if upon a given date he had a given receipt for two hundred and twenty-five bales of cotton "marks various," when the identical number and no more were then actually on hand, he would not permit the storer, who subsequently stored with him two hundred and twenty-five other bales, to draw out the first lot of cotton by special order, without the simultaneous surrender of the particular outstanding receipt which he had given. Under that condition of things he evidently considered the identity of the cotton covered by the receipt fixed by the facts of the case, and that under his own contract he would have to hold that particular cotton for the benefit of the holder of the receipt given, as the owner had lost control over it, and it was no longer subject to transfer by him or attachment or seizure by his creditors; that matters would stand as if without the receipt the storer had directed to them an order in favor of the bank to deliver to it the cotton in the warehouse on the 11th of January, and they had accepted the order. In this case not only had the warehouse receipts been endorsed by Marx, but the bank had immediately notified the defendants of the transfer or assignment of the receipts. Hennen's Digest, verbo "Attachment," page 135, No. 2, page 138, No. 1; page 139.

If, in the case thus assumed by the witness, there had been two outstanding receipts instead of one covering the exact number of bales then on hand, the fact that these receipts did not, on their face, specify any particular cotton would complicate the situation between the two parties holding them; the difficulty, however, would be one of "evidence," and one claimant by having transferred to him the rights of the other could dispose of that trouble. In the absence of such transfer the holders of the two receipts would prorate the proceeds of the cotton, holding them against the claims of other parties.

We think the issue in this particular case a restricted one. Are the defendants liable to plaintiffs under the special state of facts shown? We think not. Plaintiffs claim through a pledge dated January 12, 1894, of receipts which call for no particular cotton. The most they can claim is, that the defendants should legally account for the cotton in store for account of Simon E. Marx on the 11th and 12th of January, 1894. Now of the number then on hand, two hun-

dred and four bales have in suits, brought against these defendants, and to which plaintiffs were made parties, been decreed to have belonged to the plaintiffs in those suits. Defendants were ordered to deliver the same to the claimants, the court holding that Marx did not have possession under circumstances such as to justify or warrant his pledging the same.

The judgments in those cases bind the plaintiffs and conclusively relieve the defendants in respect to them. In calling the plaintiffs into those cases, defendants performed their duty. The defendants in receipting for the cotton did not warrant the title of the storer nor the circumstances of his possession. Insurance Co. vs. Kiger, 130 U. S. 352, 356.

Plaintiffs claim that there were one hundred and twenty-six bales of cotton in the press on the 11th and 12th of January, which Marx sold on the 11th and which defendants delivered on the 12th of January, 1894, to Townsend, Cowie & Co., under orders from the vendor, and that defendants, with knowledge of their outstanding receipts and that they had been pledged to them, should have held them for their benefit.

The evidence establishes that on the 11th of January, Marx sold one hundred and twenty-six bales of cotton to Townsend, Cowie & Co., then stored in defendants' warehouse; that at that time there were outstanding receipts in his hands which defendants had issued to him; that the latter declined to deliver the cotton to the vendee until these receipts should have been produced and surrendered; that Marx undertook to do so; that in anticipation of this being done on that day (the 11th), the receipts were drawn up, which plaintiffs now hold, which were to recognize the balance of cotton on hand after the delivery to Townsend, Cowie & Co. That Marx did not produce and surrender the receipts held by him until the 12th; that on their surrender on that day, the delivery of one hundred and twenty-six bales was made to his vendees, and thereafter the receipts, which had been dated on the day before upon the supposition that the outstanding receipts would have been then surrendered, were delivered to Marx, who having them, pledged them to the plaintiff bank. We think it was right and proper that the circumstances under which the new receipts were dated, as of the 11th instead of the 12th of January, should be shown. Plaintiffs' pledge bore date of the 12th, and there is nothing to show

that they had any knowledge of the fact that Marx owned the cotton which was sold and delivered to Townsend, Cowie & Co., or that it was in defendants' warehouse. They did not act on the strength of that particular cotton, but relied upon the simple fact that, at the date of the receipts, defendants held in store for account of Marx two hundred and twenty-five bales of cotton. This quantity they did in fact have. When defendants issued the new receipts all outstanding receipts had been called in. Plaintiffs had no rights of any kind then in existence. When, on the 12th of January, Marx (after having received the new receipts) offered them for pledge to the plaintiffs, it was their duty, if it was their expectation or their wish to be protected by particular cotton, to insist upon the insertion of marks which would specifically designate it, or that the pledgor should give an order for delivery supplementing the uncertain description of the cotton receipted for. C. C. 1922, 1923.

Plaintiffs claim that if defendants had delivered to them when called upon to do so, the cotton which was subsequently declared to have been the property of the plaintiffs in the various suits and to have been illegally attempted to be pledged by Marx, the present complications would not have arisen; that they would have received and disposed of it. Defendants reply that they themselves were in danger in the premises and justified in taking the action they did, and that, even if plaintiffs had received the cotton and sold it, they would and should have been held legally liable to the actual owners for improperly converting to their own use property belonging to another person, and that the ultimate result, so far as plaintiffs were concerned, would be of no benefit to them. We think that defendants were justified in protecting themselves, and that plaintiffs' claims presented from the particular standpoint we are now considering, are without foundation. C. C. 2312.

After deducting the cotton on hand, which was sold and delivered to Townsend, Cowie & Co., and that which was decreed to belong to persons other than Marx, there remained in the possession of the defendants on the 12th of January, 1894, seventy-seven bales of cotton. The question is, as between the plaintiffs and the administrator of the succession of Marx, which is entitled to a judgment for its recovery.

The administrator of the succession of Marx claims them as holder of a receipt issued by defendants for fifty bales of cotton of " vari-

ous marks" *of a date later than the receipts held by the plaintiffs.* Both claim under receipts not specifically describing the cotton referred to. With its delivery of this cotton the relations between the defendants and Marx will come to an end. Defendants stand indifferent as to whom it should be decreed. The lower court adjudged the property to defendant for general distribution.

Were Marx still alive and the present contest one between him and the plaintiffs, we think he could scarcely be permitted to come in competition with the creditor to whom he had assigned those press receipts. (Salzman vs. His Creditors, 2 Rob. 241; Blood vs. Vollers, 6 An. 785; Neuton vs. Gray, 10 An. 67). It is true that as between certain parties and under certain circumstances the want of specification of the precise property covered by the attempted pledge would result in the most serious consequences; but, as between Marx himself and the State National Bank, we think matters were in such a condition as would have forced him to recognize the rights of the bank over this remnant on hand. By the process of exhaustion and the force of circumstances it would have been demonstrated that the only cotton to which the receipts were applicable, and which he could legally pledge, was this particular cotton. He would be forced in order to give any effect to his contract to recognize the bank's rights.

The receipts as written, it is true, do not express in terms that defendants will deliver to Marx or his order two hundred and twenty-five bales of cotton on the surrender of the receipt. They declare that defendants have received that number of bales of cotton from Marx, which are deliverable only upon surrender of the receipt duly endorsed. It is by reason, we suppose, of the peculiar phraseology of the receipts that they have not been deemed sufficient of themselves and by themselves to call for a delivery, and that a special order from the storer has been required to be produced supplementing and to accompany them. We find that the defendants have written across the receipts the word "negotiable." Defendants contend that these words have no force or significance; that "negotiability" is a "legal result" of a fact only, and can not be brought about by stipulation or contract. We are, however, to consider whether, in placing that word upon the receipts, the defendants did not intend to contract to consider the receipts, as written, a promise on their part "to deliver to Marx or

to his order," and carry those words practically and substantially into the receipts, even granting that these words, in addition to the endorsement of the storer of the goods, would be necessary to be inserted in the receipts to operate a transfer or assignment of the same. We think it was clearly the intention of the parties, either that the receipts themselves when endorsed in blank should import an order for the delivery of the cotton to the holder, or that Marx should subsequently give substantial order for delivery supplementing the receipts. If Marx were alive to-day, claiming the cotton as against the bank, we think he would be under a legal obligation to execute an order on the defendants for the delivery to the plaintiffs of the cotton now on hand; law and equity would call for his doing so, and "equity considers that done which should be done." *The bank had, before the death of Marx, notified defendants that it held their receipts for the cotton on hand on the 1st of January, 1894, under Marx's endorsement.*

But Marx having died, we are to consider the effect of that fact upon the rights and obligations of parties. The question now is whether, there being no parties claiming special fixed rights upon this remnant of cotton, either by way of purchase or privilege, and the contest being narrowed down between plaintiffs (holding under a pledge which might be imperfect in some respects as to certain parties and under certaim circumstances) and the mass of ordinary creditors of the succession of Marx, represented by the administrator of that succession, the defect in the EVIDENCE of the pledge is to work any change in the situation from what it would have been were Marx alive, and he, and not his succession representative, were one of the contesting parties. We think it does not. The *ordinary creditors of a person*, in the absence of fraud, hold UNDER the rights of their debtor. Gardiner, judge, in Candee vs. Lord, 2 N. J. 269, declared that "in creating debts, or establishing the relations of debtor and creditor, the debtor is accountable to no one unless he acts *male fide*.

* * * The claims of other creditors upon the debtor's property are, through him and subject to all previous liens, preferences or conveyances made by him in good faith. Any deed, judgment or assurance of the debtor, so far at least as they CONCLUDE HIM, must ESTOP HIS CREDITORS and all others." This doctrine may be too broadly stated, but not too much so, in our opinion, for the purposes of this case. [Succession of Nash, 48 An., p. 1573; Nicolopulo vs. Creditors,

37 An. 472; Webre vs. Beltran & Co., 47 An. 195; Baldwin, Recorder, vs. McDonald, 48 An. 1460.]    We think the judgment of the District Court in rendering judgment in favor of the succession of Simon E. Marx, recognizing it to be the owner of the remnant of cotton (seventy-seven bales) now on storage in the Louisiana Press, stored therein by Simon E. Marx, and ordering its delivery by the defendants to the administrator of the succession of Simon E. Marx to be by him accounted for in due course of administration, is erroneous, except in so far as it recognizes the ownership of said cotton to be in the succession of Simon E. Marx—to that extent the judgment of the District Court in favor of the succession of Marx is correct, and it is hereby affirmed; beyond that it is annulled, avoided and reversed. Hepp vs. Glover, 15 La. 461; Deloach vs. Jones, 18 La. 447; Frazier vs. Wilcox, 4 R. 517; Marston vs. Deuberry, 15 An. 519.

For the reasons herein assigned, it is ordered, adjudged and decreed that the defendants do deliver to the plaintiffs the seventy-seven bales of cotton now on storage in their press, the Louisiana Press, which were therein stored by Simon E. Marx, the said cotton to be received and sold by the State National Bank and the proceeds applied by the bank as far as they extend to the payment of the promissory note of Simon E. Marx, of which it is the holder, for eight thousand dollars with interest thereon, which note was referred to in plaintiff's petition and filed in evidence herein—the court recognizing and decreeing that payment of said note stands secured as to its payment by pledge upon the cotton herein ordered to be delivered by defendants to the plaintiff.

In the event of the defendants, Bryant & Mathers, failing to make delivery to the plaintiffs, the State National Bank, of the cotton herein ordered to be delivered by them to said bank, it is ordered, adjudged and decreed that there be judgment in favor of the plaintiff, the State National Bank, and against the defendants, Bryant & Mathers, for the value of each bale of said cotton not delivered, the value of each bale being hereby fixed at forty dollars.

It is ordered, adjudged and decreed that the judgment appealed from in favor of the defendants, Bryant & Mathers, and against the plaintiff, the State National Bank, be and the same is hereby annulled, avoided and reversed, and judgment is hereby rendered in favor of the plaintiff bank against the defendants as hereinbefore decreed, with costs in both courts.