ODOM, Justice.
 

 On November 10, 1927, the plaintiffs, Mrs. Cason and her children, sold certain real property to Raymond E. Cecil for $7,000. One thousand dollars was paid in cash, and for the balance the purchaser executed seven notes, each for $857.14, made payable to his own order and by him endorsed in blank, falling due in one, two, three, four, five, six and seven years from the date of the sale. The notes were secured by vendor’s lien and special mortgage on the property sold.
 

 On May 31, 1934, plaintiffs instituted foreclosure proceedings against Cecil to collect four of the notes — those maturing in 1931, 1932, 1933, and 1934 — alleging that the first three notes of the series had been paid. The property mortgaged was seized and advertized for sale. Whereupon, Dr. Sidney C. Aymond filed third opposition, alleging that he was the holder and owner of the third note of the series, which fell due on November 10, 1930; that he had purchased the note from plaintiffs, paying the full face value thereof with accrued interest; and prayed that he be paid by preference, out of the proceeds of the sale, the amount of the note which he held, together with accrued interest.
 

 The plaintiffs, in answer to the third opposition, denied that opponent was the holder and owner of the note, denied that he had purchased it, and alleged that i't had been paid by Cecil, the maker, and that the debt represented by it had therefore been
 
 *46
 
 extinguished. There was judgment for third opponent, as prayed for, and plaintiffs appealed.
 

 The note held by Dr. Aymond and those held by the plaintiffs in the foreclosure proceeding were of the.same series, secured by the same mortgage, arose out of the same transaction, and were all owned originally by plaintiffs. Dr. Aymond is seeking to have his note paid by preference out of the proceeds of the sale and relies upon the doctrine that the holder of a series of notes, secured by the same mortgage, cannot transfer one of them to a third party and receive the price therefor, and thereafter compete with his transferee in the distribution of the proceeds of the sale of the mortgaged property, if the proceeds of the sale are insufficient to pay all of the notes in full, as is the case here. Butler v. Clarke, 44 La.Ann. 148 citing six cases at page 154 of the opinion, 10 So. 499.
 

 That the plaintiffs received payment in full for the note which Dr. Aymond now claims to own is not disputed. The amount of the note, together with accrued interest thereon, was remitted to plaintiffs by the Marksville Branch of the Citizens Bank & Trust Company of Bunkie, on March 4, 1931.
 

 The facts are that all of the notes of the series' were made payable at the Citizens Bank & Trust Company of Bunkie, which had a branch at Marksville. Note No. 3 of the series, which Dr. Aymond now claims to own, was deposited in the branch bank at Marksville for collection on or about February 9, 1931, by Grover S. Sellers, a son-in-law of Mrs. Cason, who had full authority to represent, and did represent, Mrs. Cason and all others interested in the note in all matters pertaining to the collection thereof. The note was forwarded by the Marksville Branch to the main branch in Bunkie, which notified Cecil, the maker, that it was there for collection. Cecil told Mr. Caldwell, active vice-president of the bank, that he was not able to take it up unless he could borrow the money, and there is some testimony to the effect that he applied to the bank for a loan, which was declined. The note remained in the bank for some time, and nothing was done. Finally Mr. Sellers, who, as said, placed the note with the bank for collection, went to the bank and spoke to Mr. Caldwell about it, stating that he wanted it “taken up”. Caldwell informed Sellers that he did not think Cecil could take it up. Whereupon Sellers said something to Caldwell “about the bank taking it up”, and was informed that the bank did not care for the paper, for the reason that it was past due.
 

 Caldwell says he told Sellers that he, Caldwell, might be able to get Dr. Aymond (third opponent) to take it up, as Aymond had previously told him that he would like to purchase some well secured mortgage paper in order that he might get more interest on the money which he had on deposit in his savings account than he was then getting. Caldwell says that Sellers told him “that it did not make any difference who took it up, so long as they got the money”.
 

 Caldwell testified that Dr. Aymond had previously purchased mortgage notes and that he made it clear to Mr. Sellers that,
 
 *48
 
 whereas the bank would not take up the note, in all probability Dr. Aymond would do so; and, in response to questions asked him by the trial judge, Caldwell testified that Sellers made no objection to Dr. Aymond’s taking up the note.
 

 After this conversation, Sellers left the bank, and later on Mr. Caldwell saw Dr. Aymond and told him about this note. Dir. Aymond asked Caldwell whether the note was well secured and good, and Caldwell told him that it was. Whereupon Dr. Aymond, according to Caldwell’s testimony, purchased the note and paid for it by check drawn against his savings account in the bank, and the note was delivered to him by Caldwell. The amount of the note was $857.14, and with accrued interest the total amount due was $938.46. Cecil, it seems, paid the interest and $157.14 on the principal, so that the balance due was $700, this being the amount paid by Dr. Aymond. On March 5, 1931, the Bunkie Bank remitted to its branch at Marksville, where the note was originally deposited for collection, the full amount of the note, plus the accrued interest. This amount, according to Sellers’ instructions as agent of the plaintiffs, was deposited to his credit and was disbursed among the heirs interested by checks drawn by Sellers covering their respective shares. Sellers said he did not know “in what form they [meaning the bank] received it”, but he had the bank credit the amount to his account so that he might disburse it.
 

 The defense set up by these plaintiffs, that Dr. Aymond, third opponent, did not, purchase the note and that it was paid and extinguished, is without merit. That he did purchase the note from the bank through Caldwell, its active vice-president, and that he paid for it by check drawn on that bank, and that the note was delivered to him by the bank, are facts which are proved beyond question. He did not intend to pay the note for Cecil, nor did he intend to lend Cecil the money, as contended by plaintiffs. The testimony of both Caldwell and Cecil shows that Dr. Aymond had no dealings whatever with Cecil. His dealings were with Caldwell, active vice-president of the bank. Dr. Aymond knew, of course, as did Caldwell, who told him that the note was well secured by mortgage on real estate, that, if the note were paid, the debt would be extinguished and it would be a dead piece of paper. Dr. Aymond wanted the note and purchased it, because Caldwell told him it was well secured and good. Dr. Aymond did not pay the note, but paid for it.
 

 Dr. Aymond was asked whether he inquired of Caldwell whether he had authority to sell the note, and said he did not but asked Caldwell whether plaintiffs were willing, and was told by Caldwell that Sellers had asked that someone take up the note. Dr. Aymond knew that plaintiffs owned the note but did not mention the matter to them. Under the circumstances, he had a right to assume that the owners of the note were willing to sell it and that Caldwell, representing the bank, was authorized to make the sale, receive the price, and make delivery of it.
 

 There is no question of fraud or bad faith, on the part of anyone involved in
 
 *50
 
 this case. Caldwell acted in perfect good faith in selling the note to Dr. Aymond. But counsel for plaintiffs say that Caldwell was not authorized to sell, the note and therefore the sale made by him to Dr. Aymond was not binding upon them.
 

 In support of this contention, they rely mainly on the admitted fact that the note was placed in the bank by Sellers for collection. There would, perhaps, be merit in this contention if Sellers had done no more than deposit the note for collection. The authority of Caldwell, representing the bank, to sell the note rests not upon the mere fact that the bank had the note originally for collection, but upon Sellers’ subsequent conduct and implied agreement that Caldwell might sell it.
 

 Some time after the note was placed in the bank for collection by Sellers, he went back to the bank to inquire why no remittance had been received and was told by Caldwell that Cecil, the maker, could not pay. Sellers knew then that Cecil had defaulted. But he did not then or later ask that the note be returned to him in order that he might proceed by foreclosure against Cecil to collect it. To the contrary. According to the testimony of Caldwell— and this is not seriously disputed by Sellers —Sellers asked the bank to take the note up, which Caldwell understood to be a request that the bank buy it. Caldwell said, referring to the conversation between him and Sellers after Sellers had been informed that Cecil could not pay the note:
 

 “That’s the words he used — ‘take it up’. I got the impression he wanted the Bank to take the note. Sell it to the Bank. He made the statement ‘We want to sell the note’. ‘It makes no difference who takes it — just so we get the money’.”
 

 Later on in his testimony, Caldwell stated that he could not say positively that Sellers used the word “buy” or “sell”, and a great deal is said by counsel for appellant about this part of Caldwell’s testimony. But this is not all that Caldwell said. What he said when asked whether he recalled distinctly whether Sellers used the word “buy” was this:
 

 “That’s been a long time. I wouldn’t say positively he used the word buy or sell or the expression he used, but he used the term the Bank take the note and pay it for Mr. Cecil.”
 

 This is in line with his other testimony that Sellers wanted the bank to take up the note for Cecil, which meant, of course, that, if the bank took the note up, it would remit the amount to plaintiffs. Counsel for plaintiffs say in their brief:
 

 “Of course, Mr. Sellers was after the money and it did not make any difference to him who would ‘take it up’ that is, pay the note for Cecil — not buy the note.”
 

 Sellers knew that the bank was not a party to the paper and knew that it was in no way bound for its payment, and he must have known that, if the bank “took up” the note, the bank would expect the note to continue in existence with all its accessories, for, if the note had been extinguished by payment, the bank would have no recourse for reimbursement except an action against Cecil, and Caldwell had in
 
 *52
 
 formed Sellers that Cecil had no credit with the bank.
 

 Furthermore, after Caldwell told Sellers that the bank would not “take up” the note, he told him he could probably get Dr. Aymond to take it up. Sellers did not object, left the bank, and did not return. He therefore knew that Caldwell expected to try to induce a stranger to take up the note. Sellers does not seriously deny this. After saying that he went to the bank to inquire why the bank had not remitted and that the bank had informed him that Cecil could not pay, he said he asked Caldwell why he did not lend Cecil the money. He went on to explain the substance of what Caldwell said. , We quote from his testimony, page
 
 64
 
 of the record:
 

 “and he [meaning Caldwell] mentioned something about Mr. Cecil borrowing money, and if I recollect, he mentioned Dr. Aymond, but insofar as dealing between Mr. Aymond and me, there was nothing said. I told him T don’t care how Mr. Cecil gets that money so long as he takes the note up’.”
 

 Sellers was then asked:
 

 “Q. It makes no difference to you how Mr. Cecil got the money so long as he took his note up ? A. Yes.”
 

 He stated later that he did not want to sell the note. “I preferred to hold the note.” This is wholly inconsistent with his other testimony. He had stated previously that he wanted the note taken up, and later on in his testimony he said that he told Cecil that he would agree to hold the other notes as long as he paid the interest, “if this note was taken up”. The testimony shows beyond question that Sellers was insisting all along that plaintiffs get the money for this note, and that it made no difference with him how the money was obtained.
 

 Under all the circumstances, plaintiffs are estopped to deny the authority of Caldwell, representing the bank, to sell the note. While Caldwell was not1 expressly authorized to- make the sale, he had implied authority.
 

 “An implied agency is also an actual agency; it is a fact which is to be proved by deductions or inferences from other facts and circumstances. It is often established from the words and conduct of the parties and the circumstances of the particular case.” American Jurisprudence, Volume 2, Section 23, page 25.
 

 In this connection, it is proper to state that Sellers had full and complete authority from all parties interested in the note to make such arrangements for its payment as he saw fit. He represented all parties concerned. This note and the others of the series belonged to Mrs. Marceline Cason, widow of Ledeu M. Furlow, and the children of her deceased husband, one of whom was the wife of Mr. Sellers. Mrs. Furlow testified that Mr. Sellers, her son-in-law, was authorized to attend to all business transactions in’ connection with the notes. Mr. Sellers testified that he had collected the first two notes of the series and had disbursed the proceeds, just as he disbursed the proceeds of the note in controversy. What Mr. Sellers did in connection with this note was binding upon all
 
 *54
 
 parties. The following general principles, relating to the payment of negotiable instruments, are applicable here:
 

 “Whether a transaction by which a negotiable instrument is taken up by one who is neither a party to the paper nor in any way bound for its payment constitutes a payment or a purchase is a question of intention — one of fact rather than of law — and must be settled by the evidence. It will ordinarily be considered a purchase in the absence of anything to show a contrary intention. A fortiori, if it appears that it was the intention to continue the existence of the note and not to cancel it, the transaction will be sustained as a purchase, at least where such intention is coupled with a power in the holder or in his representative to whom the judgment (instrument) is made to sell and transfer the instrument. Thus, money paid by a third person to the holder of a note under an agreement that the note shall be assigned to the one making the payment is not a payment on the note.” American Jurisprudence, Volume 8, Section 830, page 478.
 

 Sellers knew when he left the bank that Caldwell was trying to negotiate the note and was not trying to get Cecil to pay it. He stood by and permitted Caldwell to make the sale. Neither he nor those he represents can be heard to say now, after Caldwell sold the note and after third opponent paid for it in good faith and after plaintiffs have received the proceeds thereof, that Caldwell was not authorized to make the sale. Knowing all the facts, they acquiesced in the sale.
 

 It is a settled rule that a holder of a series of mortgage notes, representing debts arising from the same transaction and secured by the same mortgage, who assigns one or more of the notes, cannot compete with his assignee for the proceeds of the sale of the mortgaged property when the amount of the proceeds is not sufficient to satisfy both. It was said in Salzman v. His Creditors, 2 Rob. 241, 244, “It would be contrary to good faith, that the vendor of a claim, after receiving the price of it from the assignee, should, by his own act, prevent the latter from recovering the sum he has paid.” Ventress v. His Creditors, 20 La.Ann. 359; Barkdull v. Herwig, 30 La.Ann. 618; Reine v. Jack, 31 La.Ann. 859; Abney v. Walmsley, 33 La.Ann. 589; Citizens’ Bank v. Maureau, 37 La.Ann. 857; State Nat. Bank v. Bryant, 49 La.Ann. 467, 22 So. 89.
 

 In Butler v. Clarke, 44 La.Ann. 148, 155, 10 So. 499, 500, it is said that “The doctrine rests upon the authority of Troplong and Grenier”.
 

 This doctrine is applicable here. It would be inequitable to permit these plaintiffs, after receiving full consideration for the note, to defeat third opponent’s claim for reimbursement in full for the amount he paid for the note, with interest. .
 

 The judgment is affirmed, with costs.
 

 LAND, J., absent.