[No. 35212.    Department Two.    August 4, 1960.]

PACIFIC SUPPLY COOPERATIVE, *Appellant*, v. UNITED FARMERS COOPERATIVE, INC., *et al.*, *Respondents*.[1]

*Cameron Sherwood* and *William M. Tugman*, for appellant.

*Houghton, Cluck, Coughlin & Henry*, for respondent United Farmers Cooperative, Inc.

PER CURIAM.—This is, in its essence, a fraud action tried to the court. This case (like many such actions) could have been decided either way, depending upon which witnesses the trial court believed and what inferences it drew from the undisputed facts.

The plaintiff's evidence met only two-thirds of the recognized test in fraud cases: It was clear and cogent, but it was not convincing to the trial court.

Our examination of the record satisfies us that there is substantial and credible evidence supporting the trial court's findings on disputed facts, and that those findings are decisive of the case. Consequently, despite the length of the record and of the briefs, there exists no justification for a long opinion. The testimony will be condensed to pin point only the decisive factual issues.

The plaintiff, Pacific Supply Cooperative, hereinafter called "Pacific," is a wholesale nonprofit farmers' cooperative association which had, since 1947, supplied gasoline and other petroleum products to the defendant, United Farmers' Cooperative, Inc., hereinafter called "United," a nonprofit farmers' cooperative corporation engaged in the business of acquiring, for its individual patrons, certain supplies and services at cost; it operated a service station at Toppenish.

By December 21, 1956, United was in dire financial circumstances and its indebtedness to Pacific amounted to $61,073, of which only $15,000 was secured by a mortgage on the assets of United. At that time new capital in the amount of $35,000 was available to United through the Small Business Administration (hereinafter referred to as S. B. A.), if Pacific would subordinate its indebtedness to that of the S. B. A., and make no effort at collection for a five-year period. This additional capital was essential if United was to continue operations. On that date Pacific agreed to accept a second mortgage on the assets of United for the amount of its indebtedness, subject to the S. B. A.'s first mortgage. Pacific also agreed to execute a "standby agreement" which would, for a five-year period, preclude it from collecting the indebtedness due it or from foreclosing its second mortgage. Pacific also agreed that no interest would be charged on the indebtedness during the five-year-standby period and made other concessions.

[1] Reported in 354 P. (2d) 718.

On January 22, 1957, Pacific and United executed and delivered to S. B. A. the subordination and five-year-standby agreements; and S. B. A. advanced $35,000 and took a first mortgage on United's assets for that amount.

The gist of this case is whether, as part of the consideration for the subordination and standby agreements and other concessions by Pacific, United agreed to enter into a side agreement whereby it would give its exclusive patronage to Pacific during the standby period of five years; or whether, if there was no specific promise to enter into an exclusive patronage agreement—to quote appellant's statement in its brief—

" . . . estoppel will create an enforceable contract to avoid injustice due (a) to acceptance by United of benefits; and (b) by reason of its deliberate silence when there was duty to speak, when it knew . . ." (p. 107)

that Pacific was relying on such an exclusive patronage agreement.

Pacific urges that United agreed to such an "exclusive patronage" agreement at a meeting of the representatives of both organizations on December 21, 1956.

The trial court found that the representatives of United did not accede to an exclusive patronage agreement on December 21, 1956, but that at the meeting held on that day—when for the first time in negotiations to secure additional capital, which had extended over several months, the suggestion of such an agreement was made—United's then manager stated specifically that

" . . . United was not willing to execute any exclusive patronage contract other than its Membership Agreement with Pacific, because the Membership Agreement already in effect was sufficient . . ."

(We insert here a parenthetical statement to make clear the distinction between the exclusive patronage agreement referred to throughout this opinion, which Pacific claims was part of the consideration for its subordination and standby agreements, and the exclusive patronage provision which was part of United's membership agreement with Pacific. Under the latter agreement the exclusive patronage provision could be terminated at any time on sixty days' notice by either party; and, in the event of a violation, liquidated damages were prescribed. The exclusive patronage agreement, with which we are concerned in this opinion, could not be terminated during the five-year period of the standby agreement; or, if we consider the proposed agreement submitted to United for execution, the time was extended to as long as United was indebted to Pacific, which could well be for a much longer period. Only in this parenthetical statement will any reference be made to the exclusive patronage provision in the membership agreement; suffice it to say that when it was violated Pacific exercised its rights and secured the liquidated damages to which it was entitled.)

The trial court further found that prior to January 22, 1957, when the representatives of Pacific and United met for the execution of the necessary documents to clear the way for the S. B. A. financing, United's board of directors had decided that United would not give an exclusive patronage agreement to Pacific if it was requested. No such request was

968

made at the January 22nd meeting, and the subordination and standby agreements were executed and delivered to S. B. A. at that time.

To a subsequent request by Pacific, made in a letter from its attorney dated January 24, 1957, that such an exclusive patronage agreement be entered into, United made no reply until a specific refusal was made on July 18, 1957.

Pacific complains bitterly that United had been (for about a year) more or less actively investigating the possibility of securing from some other supplier gasoline and other petroleum products for less than it was paying Pacific. The final determination to change suppliers, however, was not made until July 23, 1957; true, United had not been publicizing its exploration of the possibility of a change in wholesale suppliers. It would seem to be the duty of United to its members to secure lower wholesale prices, if it could, and we agree with the trial court that there was no duty to disclose the possibility of a change not yet decided upon. On this phase of the case the trial court found:

"On July 23, 1957, after having previously considered the matter at its meeting in May and after having discussed the matter with SBA and with other former member units of Pacific which had changed to Farmers Union Central Exchange, United's board of directors unanimously voted to, and thereafter within a few days did, withdraw and cease patronage of Pacific. The reason for changing suppliers on that date was United's urgent need, under the business conditions existing at that time, for the lower prices then available from Pacific's competitor, Farmers Union Central Exchange, a farmers' wholesale cooperative organization having its principal office in St. Paul, Minnesota, from which United has obtained lower prices. United at all times thereafter continued to purchase its supplies from Farmers Union. Pacific demanded that United resume exclusive patronage from it or pay its indebtedness, but United has refused. . . ."

Alleging breach of the claimed exclusive patronage agreement, Pacific commenced this action. When the case went to trial, it was agreed, in effect, that if Pacific established that it was entitled to the benefits of such an exclusive patronage agreement, then the standby agreement was no longer binding, and Pacific (fully protecting S. B. A.) was entitled to foreclose its second mortgage securing all of United's indebtedness to Pacific. As the trial court put it, in its memorandum decision,

". . . The primary issue is a very important one of timing—may Pacific foreclose its mortgage now or must it wait five years without interest until the expiration of the standby period?"

The trial court found that there had never been a meeting of the minds between Pacific and United for an exclusive patronage agreement; that there had been no fraudulent misrepresentations, no promissory fraud, no fraudulent concealment, no estoppel either by representation or by silence, and no unjust enrichment.

All of the issues inherent in the foregoing findings—such as confidential relationship and duty to disclose—were examined with painstaking thoroughness by the trial court, and we could add but little to its analysis.

We have heretofore indicated our view that this appeal is, in effect, an invitation to this court to try this case *de novo* and substitute our

findings for those of the trial court. We can only repeat what we have said in somewhat varying language—at least seven times in the last completed volume of our decisions—

"We will not overturn the findings of the trial court where, as in this case, they are supported by substantial evidence in the record. . . ." *In re Napier's Estate* (1959), 55 Wn. (2d) 194, 200, 347 P. (2d) 192.

See *Martin v. Neeley* (1959), 55 Wn. (2d) 219, 347 P. (2d) 529; *Ostiguy v. Franke Constr., Inc.* (1959), 55 Wn. (2d) 350, 347 P. (2d) 1049; *Kelly v. Kelly* (1960) 55 Wn. (2d) 494, 348 P. (2d) 652; *Stewart v. Smith* (1960), 55 Wn. (2d) 563, 348 P. (2d) 970; *Udhus v. Peglow* (1960), 55 Wn. (2d) 846, 350 P. (2d) 640; *Stringfellow v. Stringfellow* (1960), *ante* p. 957, 350 P. (2d) 1003.

The trial court's judgment of dismissal is affirmed.