FIRST SECURITY BANK OF UTAH
N.A., and First Security Financial,
Plaintiffs and Appellees,

v.

BANBERRY DEVELOPMENT CORPO-
RATION, a Utah corporation, Eugene
L. Kimball, et al., Defendants and Ap-
pellants.

Eugene L. KIMBALL, Cross–Claimant
and Appellant,

v.

SUMMIT COUNTY TITLE, et al.,
Cross–Defendants and
Appellants.

Nos. 870034, 870074.

Supreme Court of Utah.

Jan. 2, 1990.

Rehearing Denied Nov. 20, 1989.

Robert S. Campbell, Jr., E. Barney Gesas, Paul T. Moxley, Tracy H. Fowler, Edward M. Garrett, Salt Lake City, for Sidney M. Horman, Banberry Development Corp., and Banberry Crossing.

Clark Waddoups, LeRoy S. Axland, Mark E. Wilkey, Salt Lake City, for Com. Land Title Co.

Malcolm A. Misuraca, James L. Beyers, Santa Rosa, Cal., Craig S. Cook, Merlin R. Lybbert, Michael R. Carlston, Pamela G. Heffernan, Rodney R. Parker, Salt Lake City, for Eugene L. Kimball and Keith E. Garner.

Richard D. Burbidge, Stephen B. Mitchell, Salt Lake City, for Summit County Title Co.

Don Hutchinson, Ronald E. Nehring, Salt Lake City, for Gregory P. Nelson and Victor L. Fowler.

David E. Bean, Layton, for Western Woodlands.

Barney Saunders, Park City, for Don Hutchinson.

Gordon L. Roberts, Randy L. Dryer, Michael L. Larsen, for First Sec. Bank and First Sec. Financial.

HALL, Chief Justice:

Appellants Banberry Development Corporation, Banberry Crossing, Inc. (collectively "Banberry"), and Sidney M. Horman ("Horman") appeal a jury's determination that certain settlement and purchase agreements executed by First Security Bank and First Security Financial (collectively "First Security") and the Horman Family Trust (the "Trust") constituted fraud by appellants against Eugene L. Kimball ("Kimball") and resulted in the extinguishing of real property liens held by First Security. Kimball cross-appeals, seeking attorney fees, costs, and a determination that the court erred in refusing to instruct on the theory of civil conspiracy.

This case is based on complex facts, only pertinent portions of which will be discussed at length. In 1978, Kimball and a partner purchased undeveloped land in Park City, Utah, securing the purchase amount with a note in favor of Murray First Thrift, thereafter First Security. This property ("Prospector Ridge") was later resold to Banberry, with Banberry assuming the existing note and with Kimball accepting a trust deed for the balance of the purchase price subordinate to First Security's trust deed and a subsequently obtained development loan from First Security. Horman was a guarantor of the loan and at one point became a principal officer of Banberry.

During 1982, Banberry was unable to meet its development and financing commitments due to declining property market values. Accordingly, Kimball renounced his subordination agreement on the ground that required personal guaranties were not adequately obtained for the development loan. Kimball also recorded notices of default on his note and trust deed and scheduled a nonjudicial foreclosure sale.

First Security likewise commenced an action to judicially foreclose its trust deeds, and Kimball was later enjoined from pursuing his sale. Banberry and Horman counterclaimed, raising claims involving development projects unrelated to the Prospector Ridge property.

Based upon settlement negotiations conducted in 1984, First Security, Horman, and Banberry (collectively "defendants"), and the Trust entered into three agreements. The first agreement purported to resolve the existing counterclaims; the second restructured loan transactions between First Security and Banberry for unrelated developments, and the third directly involved the Prospector Ridge property and became the basis of this lawsuit. This agreement, enti-

tled "PURCHASE AGREEMENT" was formally entered into by First Security and the Trust. It generally provided that the Trust would assign to First Security a $1.6 million certificate of deposit in consideration for receiving either (1) an option to acquire the First Security trust deeds and notes; (2) assignment of rights against the Commonwealth Title Insurance Company ("Commonwealth"); (3) the Prospector Ridge property, if First Security bid at the foreclosure sale; or (4) proceeds First Security might obtain as an unsuccessful bidder at the sale. Also, First Security was required to continue with the judicial foreclosure action, and the Trust was to receive the interest on the certificate for the first year. The parties agreed to keep the agreements confidential.

Subsequently, Commonwealth and Kimball successfully compelled production of these agreements, and Kimball thereafter alleged that defendants committed fraud against him by keeping the agreements confidential.

This case was tried before a jury in three phases with separate jury instructions and special verdict forms. Under the first special verdict, the jury in part found that (1) Horman was the alter ego of Banberry, but not the alter ego of the Trust at the time the settlement agreements were formed and (2) the purchase agreement and transfer of the $1.6 million certificate by the Horman trust constituted a "payment" by Banberry of the trust deed notes. Under the second special verdict, the jury determined that Banberry and Horman committed fraud against Kimball with respect to the settlement agreements and that Kimball sustained damage thereby. The jury decided in the third special verdict that Banberry and Horman were not liable for punitive damages. Judgment was entered against Banberry and Horman.

The dispositive issue on appeal in relation to the fraud claim is whether a duty exist-

ed on the part of defendants to disclose to Kimball the existence and content of the purchase agreement. As we have previously reiterated,

One of the fundamental tenets of the Anglo–American law of fraud is that fraud may be committed by the suppression of the truth ... as well as the suggestion of falsehood....

Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances....

The principle is basic in the law of fraud as it relates to nondisclosure that a charge of fraud is maintainable where a party who knows material facts is under a duty, under the circumstances, to speak and disclose his information, but remains silent....

Although the pertinent inquiry in any case where fraud on the basis of nondisclosure is asserted is whether, upon any particular occasion, it was the duty of the person to speak on pain of being guilty of a fraud by reason of his silence, except in broad terms the law does not attempt to define the occasions when a duty to speak arises. On the contrary, there has been adopted, as a leading principle, the proposition that whether a duty to speak exists is determinable by reference to all the circumstances of the case and by comparing the facts not disclosed with the object and end in view by the contracting parties. The difficulty is not so much in stating the general principles of law, which are pretty well understood, as in applying the law to particular groups of facts....[1]

■ Thus, in order to be held liable for fraudulent nondisclosure, there must have

---

**1.** *Elder v. Clawson,* 14 Utah 2d 379, 382–83, 384 P.2d 802, 804–05 (1963) (footnotes and emphasis omitted; omissions in original).

been a duty to disclose,[2] the burden of establishing which is on the party alleging the fraud[3] and the determination of which is a question of law for the court to decide.[4] After it has been determined that a duty exists as a matter of law, the trier of fact resolves the question as to whether the duty was breached in the particular case.[5]

Notwithstanding the above, the parties herein have neither fully analyzed nor presented significant case law or authority squarely addressing the question before us. Also, our own research reveals a sparsity of law on the subject; and even those courts dealing with somewhat analogous cases are not in agreement in concluding whether a duty exists in situations involving real property and creditor/debtor or mortgagee(s)/mortgagor relations.[6] Ac-

2. *Sugarhouse Fin. Co. v. Anderson,* 610 P.2d 1369, 1373 (Utah 1980); *Taylor v. Gasor, Inc.,* 607 P.2d 293, 294 (Utah 1980); *Moore v. State Bank of Burden,* 240 Kan. 382, 389, 729 P.2d 1205, 1212 (1986), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987); *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank,* 108 N.M. 84, 88, 766 P.2d 928, 932 (Ct.App.1988).

3. *Brown v. Indiana Nat'l Bank,* 476 N.E.2d 888, 891 (Ind.Ct.App.1985).

4. *R.A. Peck, Inc.,* 108 N.M. at 88, 766 P.2d at 932; *In re Estate of Lecic,* 104 Wis.2d 592, 605, 312 N.W.2d 773, 779 (1981).

5. *See R.A. Peck,* 108 N.M. at 88, 766 P.2d at 932.

6. *See generally Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 773–74 (S.D.N.Y.1985) (auto manufacturer has no duty to inform middleman that car dealer is terminating franchise which will affect middleman's operation); *Branch Banking & Trust Co. v. Columbian Peanut Co.,* 649 F.Supp. 1116, 1120 (E.D.N.C.1986) (buyer has no duty to disclose to bank with security interest in debtor's crop that it was entering into agreement to supply debtor with seed in exchange for portion of crop); *Big Land Inv. Corp. v. Lomas & Nettleton Fin. Corp.,* 657 P.2d 837, 839 n. 5 (Alaska 1983) (under doctrine of conditional subordination, courts have sometimes held that senior lienholders must act in good faith and take measures to protect subordinated lienholder's security); *Agnew v. Cronin,* 148 Cal.App.2d 117, 126, 306 P.2d 527, 533 (1957) (garnishee may not wantonly sacrifice or wrongfully dispose of property upon which levy has been made, but has duty to notify creditor of garnishment); *Clark v. Baker,* 14 Cal. 612, 632–33, 29 Am.Dec. 449, 456–57 (1860) (obligation rests upon both mortgagee and mortgagor to do nothing to impair rights of other in accord with contract terms); *Peoples Bank & Trust Co. v. Lala,* 392 N.W.2d 179, 188 (Iowa Ct.App.1986) (because of confidential relationship, mortgagee bank owes duty to disclose to debtor mortgage defects on homestead exemption rights); *Dennison State Bank v. Madeira,* 230 Kan. 684, 695–96, 640 P.2d 1235, 1243–44 (1982) (bank owes no duty to disclose to loan maker bank's financial involvement with mutual debtor); *Willett v. Herrick,* 258 Mass. 585, 599, 155 N.E. 589, 595 (1927) (even if contract were mortgage, relation of mortgagor and mortgagee is not of fiduciary character), *cert. denied,* 275 U.S. 545, 48 S.Ct. 83, 72 L.Ed. 417 (1927); *Vacinek v. First Nat'l Bank of Pine City,* 416 N.W.2d 795, 799–800 (Minn.Ct.App. 1987) (bank has no duty to disclose debtor's mortgage to debtor's potential private lenders, even when lenders are longtime customers of bank); *Peoples Bank & Trust Co. v. L & T Dev.,* 434 So.2d 699, 713 (Miss.1983) (construction lender owes duty to subordinating landowner to see that funds are used for construction project), *corrected on other grounds,* 437 So.2d 7 (1983); *First Am. Nat'l Bank of Iuka v. Mitchell,* 359 So.2d 1376, 1380 (Miss.1978) (mortgagee has duty to disclose to mortgagor higher available selling price of property); *Meyers v. American Oil Co.,* 192 Miss. 180, 187, 5 So.2d 218, 220 (1941) (mortgagor and mortgagee relationship is such that neither should impair rights of other); *R.A. Peck, Inc.,* 108 N.M. at 91, 766 P.2d at 935 (bank has duty to disclose customer's financial condition to third-party contractor where bank will directly benefit from contractor's work); *Shea v. H.S. Pickrell Co.,* 106 N.M. 683, 685, 748 P.2d 980, 982–83 (Ct.App.1987) (construction lender has no duty to disclose to third-party purchaser financial condition of vendor or existence of mortgage); *Blon v. Bank One,* 35 Ohio St.3d 98, 101–02, 519 N.E.2d 363, 367–68 (1988) (creditor has no duty to disclose to borrower existence and details of finder's fee arrangement with credit arranger; bank/depositor or debtor/creditor relationship alone does not impose duty of disclosure); *Four Seasons Dev., Inc. v. Security Fed. Sav. & Loan Ass'n,* 8 Ohio App.3d 300, 301, 456 N.E.2d 1344, 1346 (1983) (senior lienholder construction lender owes no duty to protect junior lienholder and is not liable for negligent disbursement of funds diminishing junior lienholder's security; senior lienholder owes no duty to protect interests of subordinate lienholders); *Central Pennsylvania Sav. v. Carpenters of Pennsylvania,* 298 Pa.Super. 250, 257, 444 A.2d 755, 758 (1982) (junior lienholder has duty to provide notice of lien to senior lienholder before it can exert priority), *aff'd,* 502 Pa. 17, 463 A.2d 414 (1983); *Philadelphia Title Ins. Co. v. Globe Consumer Discount Co.,* 206 Pa.Super. 372, 376, 213 A.2d 80, 82 (1965) (consumer discount company has

cordingly, we conduct our own analysis of the issue.

As early as 1915, an English treatise on the law relating to actionable nondisclosure noted that there are five classifications of transactions or relations which may give rise to a duty of disclosure. The first classification consists of cases where a party negotiating for a contract is cognizant of facts of which the other party is presumed ignorant and for the disclosure of which one party must rely upon the other to enable it to form a judgment as to the expediency of entering into the contract on the terms proposed.[7]

The second classification of cases concerns situations where relationships have already been established, whether by express contract or by conduct and circumstances of the parties, which imply a fiduciary bond and a duty on the party in whom confidence is placed to exercise good faith toward the party reposing that confidence while entering into transactions during the continuance of the relationship. The relationships of principal and agent and trustee and beneficiary are generally characteristic of these types of cases.[8]

Cases outlining the third classification include those relations where it is either presumed in law or proved in fact that one party is in a superior or dominant position and the other in an inferior or servient position.[9] These relations include those evolving from domestic relations as well as relations between lawyer and client, doctor and patient, priest and penitent, and such relations of influence and domination as may be proven to exist.[10]

Cases involving a statutory duty of disclosure are included in the fourth type of classification, and to determine the nature and limits of the duty and any possible relief, the express provisions of the statute must be considered.[11] A fifth classification involves cases where a person is injured by another's breach of a duty of disclosure not owed the party complaining.[12]

Later treatises and cases have added to or clarified these classifications. For example, the Restatement (Second) of Torts provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclosed, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his

---

no duty to disclose to title insurance company existence of forged signature on its note); *Pacific Supply Coop. v. United Farmers Coop., Inc.,* 56 Wash.2d 966, 967–68, 354 P.2d 718, 720–21 (1960) (no fraudulent concealment resulting from mortgagor's failure to disclose to mortgagee/supplier that it was changing suppliers despite possible detriment to mortgage/supplier); *In re Lecic,* 104 Wis.2d at 606, 312 N.W.2d at 783 (special administrator of estate has no duty to disclose to creditors information regarding the filing of claims); W. Kerr, *A Treatise on the Law of Fraud and Mistake* 97 (1886) ("[A] first mortgagee with power of sale, who has made an advantageous contract for the sale of the mortgaged premises, may buy up the interest of a second mortgagee who supposed the property was insufficient to pay off both mortgages, with-

out informing him of the contract") (footnote omitted).).

**7.** G.S. Bower, *The Law Relating to Actionable Non-disclosure* § 1, at 2–3 (1915) (footnote omitted) [hereinafter "Bower"].

**8.** *Id.* at 3.

**9.** *Id.*

**10.** *Id.*

**11.** *Id.* at 4.

**12.** *Id.*

partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.[13]

Similarly, Professors Prosser and Keeton identify duties resulting from the disclosure of half-truths, after-acquired information, and those emanating from the mere existence of confidential or fiduciary relationships. Their treatise also discusses the "rather amorphous tendency on the part of most courts in recent years to find a duty of disclosure when the circumstances are such that the failure to disclose something would violate a standard requiring conformity to what the ordinary ethical person would have disclosed."[14] Factors important in this determination are:

(1) The difference in the degree of intelligence of the parties to the transaction. This is simply because the community sense of justice demands it;

(2) The relation that the parties bear to each other;

(3) The manner in which the information is acquired. Information which affects the value of the subject matter of a contract may have been acquired by chance, by effort, or by an illegal act. It makes a difference on the ethical equality of non-disclosure[;]

(4) The nature of the fact not disclosed. In contracts of sale of real property, if the vendor conceals an intrinsic defect not discoverable by reasonable care, there is a much greater likelihood of the existence of a duty to disclose a non-discoverable intrinsic defect than there would be to disclose something extrinsic likely to affect market value;

(5) The general class to which the person who was concealing the information belongs. It is much more likely that a seller will be required to disclose information than a purchaser;

(6) The nature of the contract itself. In releases, and contracts of insurance, practically all material facts must be disclosed;

(7) The importance of the fact not disclosed; [and]

(8) Any conduct of the person not disclosing something to prevent discovery. The act of concealment of any material fact—anything that might prevent the purchaser from buying at the price agreed on is, and should be, as a matter of law fraudulent.[15]

■ Obviously, some of these noted classifications do not apply in this case. Indeed, there is no express or implied contractual duty.[16] Also, this is not a case where a duty of disclosure may have arisen while Kimball was negotiating for a con-

---

**13.** Restatement (Second) of Torts § 551, at 119 (1977). Courts often abbreviate these classifications and circumstances, *see, e.g., First Sec. Bank v. Banberry Crossing,* 780 P.2d 1253, 1256 (Utah 1989); *R.A. Peck, Inc.,* 108 N.M. at 89, 766 P.2d at 933; *Blon,* 35 Ohio St.3d at 101, 519 N.E.2d at 367; *see also Keeton, Fraud—Concealment and Non–Disclosure,* 15 Tex.L.Rev. 1, 34–37 (1936) (pertinent factors listed), *cited in* W.P. Keeton, *Prosser and Keeton on the Law of Torts,* at 739 n. 42 (5th ed. 1984) [hereinafter "Keeton"] (itself citing *A.B.C. Packard, Inc. v. General Motors Corp.,* 275 F.2d 63, 69 n. 7 (9th Cir.1960),

for the proposition that at least until 1960 no court had adopted Keeton's theories).

**14.** Keeton at 738–39.

**15.** *Id.* at 739 (footnote omitted).

**16.** *See Horman v. Clark,* 744 P.2d 1014, 1015–16 (Utah Ct.App.1987); *supra* notes 7 and 13 and accompanying text.

tract with First Security, Banberry and/or Horman. Neither is it a case where superiority is presumed, a statutory duty exists, or Kimball was injured by a breach of a duty of disclosure owed someone else.[17] Likewise, several other factors listed (i.e., matters necessary to prevent ambiguous statements from being misleading) either fail to apply under the facts or ring hollow as circumstances compelling the creation of such a duty; and after viewing the remaining relevant classifications, we are not convinced that a duty of disclosure arose here.

" 'Whether or not a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case.' " [18] Courts have generally refrained from definitively listing the instances of fiduciary relationships in such a way as to risk excluding the penumbra of unknown or unraised relevant cases.[19] It has, however, been noted that there are generally two types of fiduciary relationships:

(1) [T]hose specifically created by contract such as principal and agent, attorney and client, and trustee and *cestui que trust*, for example, and those created by formal legal proceedings such as

guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) [T]hose implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.[20]

The subordination and mortgage contracts themselves do not impose a fiduciary relationship upon defendants. Furthermore, regarding the relationship of mortgagor and mortgagee, it has been stated that "the relation of mortgagor and mortgagee is not of a fiduciary character." [21] It has also been noted that "[a] debtor can never, merely as such, be deemed a trustee for his creditor, or liable to any of the duties which are incumbent on a trustee towards his *cestui que trust*, whether he be secured or unsecured." [22]

■ Nevertheless, Kimball claims that First Security owed him a fiduciary duty arising out of years of confidential dealings and based upon its position as a subordinating lender.[23] However, the cases Kimball cites in support of his view [24] stand for narrow propositions, involve the diversion

**17.** *See generally supra* notes 7–13 and accompanying text.

**18.** *Dennison State Bank*, 230 Kan. at 691, 640 P.2d at 1241 (quoting *Curtis v. Freden*, 224 Kan. 646, 651, 585 P.2d 993, 998 (1978)). " 'The phrases "fiduciary relations" and "confidential relations" are ordinarily used as convertible terms.' " *Lala*, 392 N.W.2d at 185 (quoting *First Nat'l Bank in Sioux City v. Curran*, 206 N.W.2d 317, 321 (Iowa 1973)).

**19.** *See Dennison State Bank*, 230 Kan. at 691–92, 640 P.2d at 1241.

**20.** *Id.* at 691, 640 P.2d at 1241.

**21.** *Willett*, 258 Mass. at 599, 155 N.E. at 595; *cf. Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Super. 455, 461, 410 A.2d 344, 348 (1979) (relationship between borrower and lender does not ordinarily create confidential relationship), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Bower*, § 347, at 313 ("[A] mortgagee is not, by virtue of the relation itself, under any fiduciary duty to the mortgagor" (emphasis omitted).).

**22.** *Bower*, § 347, at 310 (footnote omitted).

**23.** Horman's and Banberry's alleged duties are not independently discussed in the briefs, and this opinion does not distinguish between the alleged duties of the respective defendants.

**24.** *See, e.g., Big Land Inv. Corp.*, 657 P.2d at 839 n. 5; *Middlebrook–Anderson Co. v. Southwest Sav. & Loan Ass'n*, 18 Cal.App.3d 1023, 1030–38, 96 Cal.Rptr. 338, 341–47 (1971); *Collins v. Home Sav. & Loan Ass'n*, 205 Cal.App.2d 86, 98, 22 Cal.Rptr. 817, 822–25 (1962); *Peoples Bank & Trust*, 434 So.2d at 713; *Cambridge Acceptance Corp. v. Hockstein*, 102 N.J.Super. 435, 438–40, 246 A.2d 138, 140–41 (1968). These decisions apparently have engendered minimal support as a majority of courts decline to impose a duty on a lender absent a contractual basis for doing so. *See Ross v. Continental Mortgage Inv.*, 404 F.Supp. 922, 925 (E.D.La.1975) ("[U]nder Louisiana law, a lender of funds on a construction project has no liability to any party for cost overruns or diversion of funds by the contractor in the absence of a fiduciary relationship between the lender and the injured party" (citation omitted).); *Rockhill v. United States*, 288 Md. 237, 418 A.2d 197, 201–02 (1980) (majority of courts have determined there is no duty on lender to see that loan proceeds are applied to purpose of loan), and cases cited therein; *Weiss*

of construction loan funds, and do not directly address the pertinent "duty" question at issue here. Furthermore, generally speaking, the fact that Kimball "was a longtime customer of the bank is insufficient, by itself, to establish a fiduciary relationship." [25] Instead, to determine whether a fiduciary duty should be implied in law due to the factual situations surrounding the transaction and the relationship of the parties, we consider the following principles:

A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.[26]

A confidential relationship may similarly arise whenever a continuous trust is reposed by one party in the skill and integrity of another.[27] Also, as one court noted in 1910,

There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other.[28]

Applying these standards to the evidence of record, we do not find that a fiduciary relationship existed between the parties involved in the instant case. Indeed, it appears that Kimball did not place particular confidence in defendants. Furthermore, none of the defendants were in a position to have and exercise influence over Kimball. And none of the relationships implied a condition of superiority of any defendant over Kimball. While defendants had at least some minimal relationship to the mortgaged property, Kimball's interest in the property itself and/or any authority he held contingent thereto was not placed in their charge.[29] Additionally, there was no overmastering influence, dependence, or trust justifiably (and with mutual understanding) reposed;[30] there was no evidence of weakness of age, mental strength, business experience, or intelligence justifying

v. *Brentwood Sav. & Loan,* 4 Cal.App.3d 738, 745, 84 Cal.Rptr. 736, 741 (1970) (no duty owed by senior lienholder to junior lienholder who subordinated lien); *Gill v. Mission Sav. & Loan Ass'n,* 236 Cal.App.2d 753, 46 Cal.Rptr. 456, 458 (1965) (senior lienholder owed no duty to protect junior lienholder); *Spaziani v. Millar,* 215 Cal.App.2d 667, 30 Cal.Rptr. 658, 665 (1963) (existence of common law, statutory or contractual obligation of disclosure was not established); *see also United States Cold Storage v. Great Western Sav. & Loan,* 165 Cal.App.3d 1214, 1231, 212 Cal.Rptr. 232, 242 (1985) (distinguishing cases involving diversion of loan funds from case not involving implied subordination agreement; subordinating seller's assumption of risks discussed); *Rockhill,* 418 A.2d at 204 ("To find the existence of a legal duty where none is expressed in the contract has much the same effect as judicially rewriting the contract for the parties."). Kimball has not raised the doctrine of conditional subordination, and thus we do not consider whether it applies in the instant case or whether the doctrine is recognized in Utah.

**25.** *Vacinek,* 416 N.W.2d at 800 (citation omitted).

**26.** *Dennison State Bank,* 230 Kan. at 692, 640 P.2d at 1241 (citation and emphasis omitted).

**27.** *Lala,* 392 N.W.2d at 185–86.

**28.** *Yuster v. Keefe,* 46 Ind.App. 460, 466, 90 N.E. 920, 922 (1910) (emphasis omitted), *quoted in Dennison State Bank,* 230 Kan. at 692, 640 P.2d at 1241.

**29.** *See Dennison State Bank,* 230 Kan. at 691, 640 P.2d at 1241.

**30.** *Id.* at 692, 640 P.2d at 1241; *see also supra* note 13 and accompanying text.

imposition of a fiduciary relationship; [31] and Kimball did not repose a continuous trust in the skill and integrity of defendants. Instead, Kimball and defendants dealt at arm's length, with no confidential relations between them.[32] Thus we hold that First Security, Banberry, and Horman were not Kimball's fiduciaries, and accordingly they had no affirmative duty as such to disclose the existence and content of the agreements in this case.

 Likewise, we are not persuaded that a duty to disclose arose from what may be termed the "special circumstances" noted above. When a senior lien is purchased, the rights of the senior and junior mortgagees are not altered, and when a senior lien is paid, the rights are altered only to the extent that the senior lien evaporates and the junior lien is elevated to seniority. However, absent a contractual agreement imposing an obligation, there are no rights between the senior and junior mortgagees which are affected by such payment. Similarly, purchase or payment of a senior lien does not alter the basic relationship which exists between the mortgagor and the prior junior mortgagee. The mortgagor may still be subject to foreclosure on the security and suit for any deficiency if it defaults on its obligations to pay the loan. Even with knowledge of the agreements, then, Kimball would not have been entitled to prevent First Security from selling the note or allowing it to be paid. Nor could he have caused Horman or Ban-

berry to refuse to allow the Trust to do either.[33] And even if the contract served to "pay" the first mortgage, the fact that the parties entered into it did not otherwise preclude Kimball's right to foreclose on the junior lien and recover the loan amount through sale of the property and/or enforcement of the promissory note. As for any claim that Kimball was harmed by the decrease in value of security, defendants' acts did not themselves affect the actual market value of the property, the decline of which was a reasonably foreseeable risk Kimball assumed when he agreed to subordinate his first mortgage to that of First Security.[34]

Furthermore, there appears to be no difference in the degree of intelligence of the parties or in the general class to which they belong. Absent a contractual or other relationship between the parties,[35] they bear little responsibility to each other; the information "concealed" by defendants was not acquired by an illegal act; [36] and their acts were not the result of superior business acumen.[37] Kimball was apparently knowledgeable as to real estate transactions, and his failure to take reasonable steps before entering into the mortgage and subordination agreements to protect his investment by, for instance, simply requiring notice of subsequently entered agreements relating to the subject property does not justify imposition of a duty in this case.[38]

Additionally, notwithstanding Kimball's speculation that the jury must have "obvi-

---

**31.** *Supra* note 30.

**32.** *Sugarhouse Fin. Co.,* 610 P.2d at 1373.

**33.** *Cf. First Conn. Small Business Inv. Co. v. Arba,* 170 Conn. 168, 176, 365 A.2d 100, 104 (1976) ("No want of good faith is shown by failure to notify the holder of the subordinated mortgage that the borrower would not complete the building as contemplated, for it had an absolute right to proceed as it did even if the holder of that mortgage had protested.") (analyzing *Brooklyn Trust Co. v. Fairfield Gardens, Inc.,* 260 N.Y. 16, 182 N.E. 231 (1932)).

**34.** *See generally supra* notes 29–33 and accompanying text.

**35.** *See Vacinek,* 416 N.W.2d at 800 (fact that private lender was a longtime customer of a

mortgagee bank is insufficient by itself to establish a fiduciary relationship).

**36.** Absent the existence of special circumstances, a bank may have no duty to counsel a customer as to the bank's motive for participating in a transaction, *see Hurley v. TCF Banking & Sav.,* 414 N.W.2d 584, 588 (Minn.Ct.App.1987) (citing *Norwest Bank of Hastings v. Clapp,* 394 N.W.2d 176, 179 (Minn.Ct.App.1986)).

**37.** *See supra* note 15.

**38.** *See Ross,* 404 F.Supp. at 925.

ously agreed" that the Trust was Horman's or Banberry's "dummy or strawman," the jury expressly found that Horman was not the alter ego of the Trust, which verdict is consistent with the determination that an independent third party "paid" or "purchased" the subject mortgage. The fact that Horman had significant dealings with the Trust does not negate the jury's express verdict on the issue.[39] Rather, the fact of payment or purchase by a third party further supports the conclusion that it would be inappropriate to impose a duty upon a senior mortgage lienholder or mortgagor to disclose to a junior lienholder whenever a senior mortgage is "paid" or "purchased." Mortgages are bought and sold on secondary mortgage markets. Mortgagors and lienholders in first priority may remain oblivious to such transactions. However, were we to adopt the view Kimball urges, a holder of a junior lien on real property would be entitled to notice from the senior lienholders and the owner of the property when the senior liens have been purchased, restructured, or paid. Accordingly, to avoid claims of fraud, mortgagors and senior mortgagees, including those not in first priority, would be forced to track the subsequent formation and sale of junior mortgages in the event that notice of payment, purchase, or refinancing of a mortgage is required, which duty of disclosure might inevitably extend to situations involving all other secured parties.

Mortgagees and other lenders should not be penalized by choosing alternate and legally allowable approaches to conducting business and to solving the financial difficulties of mortgagors.[40] Imposing a duty upon senior lienholders to inform all junior secured parties of any occasion in which the senior lien is purchased, restructured, or paid would only serve to burden senior lienholders and restrict their right to receive repayment or allow their loans to be purchased.

Also, if possible, the nature and extent of a lender's liability must be clear, without needless ambiguity and not subject to the whim of an experienced and intelligent but disappointed party. To impose the duty urged here would result in a flood of litigation and the introduction of needless uncertainty into real estate transactions, causing possible instability in the vital lending markets.[41] Imposition of such a duty is not commensurate with the community sense of justice. We therefore conclude as a matter of law that special circumstances do not give rise to a duty of disclosure on behalf of either First Security, Banberry, or Horman.

This conclusion is supported by analogous Utah case law. In *Jeffs v. Citizens Finance Co.*,[42] this Court addressed the question of whether the seller of property (referred to for clarification in analysis as "secured vendor") could terminate a uniform real estate contract without giving an assignee/lender ("junior mortgagee")[43] of the purchaser notice of intention to forfeit and a reasonable time within which to perform the contract terms. In holding that the secured vendor was not required to notify the junior mortgagee and volunteer such facts, we stated:

> In our opinion it is no answer to say that giving notice to the [secured vendor], either actual or constructive, places the

---

**39.** In light of the determination by the jury that Horman was not the alter ego of the Trust, this is not a situation where the mortgagor with the aid of others arranged to dispose of the property so as to put it beyond the reach of the junior lienholder. *See, e.g., Elkind v. Pinkerton,* 294 Mass. 502, 503–04, 2 N.E.2d 456, 456–57 (1936).

**40.** *Central Pennsylvania Sav.,* 298 Pa.Super. at 256, 444 A.2d at 758; *cf. Arba, supra* note 33.

**41.** *See generally Ross,* 404 F.Supp. at 924–5; *Rockhill,* 418 A.2d at 204.

**42.** 7 Utah 2d 106, 319 P.2d 858 (1958).

**43.** *See generally Jack B. Parson Cos. v. Nield,* 751 P.2d 1131, 1133 (Utah 1988) ("The interest of an assignee under such circumstances has been compared to and treated as a mortgage" (citations omitted).); *id.* at 1134 (assignment was in the nature of mortgage but was not actual mortgage agreement).

burden on him to seek out one with whom he had no dealing, and volunteer facts so that a [junior mortgagee] of a real estate contract securing a loan may elect whether to perform the real estate contract or not.[44]

Instead, this Court placed the burden upon the junior mortgagee to determine the status of its assignor's contractual rights and obligations to protect the consideration for which the contract was assigned or pledged.[45] This proposition has been repeatedly used in this jurisdiction in cases involving a secured vendor's alleged duty to inform an assignee lender ("mortgagee") of the purchaser's default under or an agreement to terminate and extinguish its interest in a real estate contract.[46]

While not directly on point, these cases are persuasive support for the conclusion that a senior lienholder and mortgagor owe no duty to a junior lienholder to inform the latter of information relating to the secured property even in situations where it may affect the junior lien.[47] Accordingly, there appears no valid reason to impose such a duty on these parties.

Our conclusion that a duty did not exist in this case obviates the need to discuss other claims raised on appeal, except for the issue of whether the First Security note was paid or purchased, which question is crucial to determining the priority of the secured parties. This claim involves the correctness of the jury instruction on the issue of payment of First Security's trust deed note. As indicated above, an issue at trial was whether the Trust's assignment of the certificate of deposit to First Security constituted payment of the trust deed note so as to affect Kimball's lien priority. Kimball claimed that the trust deeds were paid by the transfer of the certificates and that he was thus entitled to be elevated in lien priority to first place. In contrast, defendants contended that the trust assignment and transfer of the certificate was for the sale and purchase of the notes, deeds, and rights in the property. At trial, the jury was instructed:

In determining whether or not the transfer of the $1.6 million to First Security Bank and First Security Financial as a result of the October 1984 Purchase Agreement constituted a "payment," the jury *may consider* the intention of the parties to that agreement. That is, whether the parties intended a "payment" or a "purchase."

"Purchase" of a note and mortgage means a transfer of ownership of the note and mortgage. "Payment" of a note and mortgage means that the note and mortgage are cancelled. Here "trust deed" and "mortgage" mean the same thing.

The intention of the parties should be determined from all of the facts surrounding the making of the agreement, and the manner in which the agreement was actually handled by the parties to it.

In making this determination you *may consider* the statements of the parties to the agreement regarding their intent, but you are not bound to determine intent on the basis of what the parties say their intent was. You should determine the parties' intent from all of the facts contained in the evidence which you may believe has [sic] a bearing on the question of intent.

44. *Jeffs,* 7 Utah 2d at 108, 319 P.2d at 859.

45. *Id.*

46. *See, e.g., Dirks v. Cornwell,* 754 P.2d 946, 949 (Utah Ct.App.1988); *Jack B. Parson Cos.,* 751 P.2d at 1133; *Wiscombe v. Lockhart Co.,* 608 P.2d 236, 238 (Utah 1980). *But cf. Hadlock v. Showcase Real Estate, Inc.,* 680 P.2d 395, 397 (Utah 1984) (buyer's assignee entitled to notice prescribed in real estate contract not assigned for security purposes).

47. *Cf. Horman,* 744 P.2d at 1016 (grantor of property has no implied obligation to protect grantee's rights by recording grantee's interest in property or by informing third parties of the existence of the interest). The determination that a duty of disclosure does not exist under these circumstances relative to a claim of fraud does not mean that agreements and other documents may not otherwise appropriately be discoverable under applicable discovery rules.

(Emphasis added.) In light of this instruction, the jury specifically found that the transfer by the Trust of the $1.6 million constituted "payment" of the trust deed notes from Banberry to First Security.

In its findings of fact and conclusions of law, the trial court thereafter stated:

Based upon the jury's answers to interrogatories submitted on issues which were common to the legal and equitable facets of the case, said Purchase Agreement and assignment constituted a payment of the First Security ... notes and trust deeds. Issues of priority arising from marshalling of assets and the One–Action Rule were effectively mooted by this payment.

. . . .

Based on the jury's answers to interrogatories submitted on issues which are common to the legal and equitable facets of the case, the October, 1984 Purchase Agreement, together with the irrevocable and unconditional delivery to First Security ... of a certificate of deposit of $1.6 million by the Horman Family Trust, constituted payment of the First Security ... loans. As a matter of law, the payment extinguishes the trust deeds of First Security ... and Kimball's lien by operation of law rises to first priority on the property in question.

Thus, the jury's determination based upon the instruction regarding "payment" directly impacted upon the issue of the lienholders' priority. Unfortunately, however, the instruction was erroneous and did not adequately state the law.

In *Ralph A. Badger & Co. v. Fidelity Building & Loan Association,*[48] this Court

in a different context reiterated, " 'The essential difference between purchasing a debt and paying it consists not in what is done or in the manner of doing it, but in the intention with which the consideration is paid and accepted, whether to extinguish the debt or to keep it alive.' "[49] The quoted treatise makes clear that, generally,

[P]ayment involves an actual or constructive delivery, by a debtor or some one [sic] for him, to his creditor, or some other person authorized to receive it, of money or something accepted by the creditor as the equivalent thereof, with the intention or purpose on the part of the payor or transferor to extinguish a debt or obligation in whole or in part, and its acceptance by the creditor for the same purpose.

... Whether or not a transaction constitutes payment depends largely upon the intention of the parties; and acts which might otherwise constitute payment will not do so when the parties do not so intend.[50]

This principle has long since been well-established. In *Weissman v. Weissman, Inc.,*[51] the Supreme Court of Pennsylvania considered the case where the mortgagees' assignee, who was president and a member of the board of directors of the corporate mortgagor at the time the mortgage was effected, brought suit for foreclosure of the mortgage. The mortgagor claimed that the mortgagees' assignee was a volunteer whose "payment" to the original creditor mortgagees extinguished the corporation's debt. In rejecting this contention, the court noted that the evidence disclosed no intention on the part of the assignee mortgagee or the original creditor

**48.** 94 Utah 97, 75 P.2d 669 (1938).

**49.** *Id.* at 111, 75 P.2d 675–76 (quoting 48 C.J. 588 (1929)); *see generally; Beacon Theatres v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (discussion of equitable and legal claims and right to jury trial); *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (tests for determination of legal versus equitable claims in case involving derivative lawsuit); *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) (actions to recover

land are actions at law triable to a jury); Annotation, *Supreme Court's Construction of Seventh Amendment's Guaranty of Right to Trial by Jury,* 40 L.Ed.2d 846 (1975).

**50.** 48 C.J. *Payment* § 1, at 585–87 (1929) (footnotes omitted); 70 C.J.S. *Payment* § 2, at 9–11 (1987).

**51.** 382 Pa. 189, 114 A.2d 797 (1955).

mortgagees to satisfy or extinguish the corporation's obligation, but that their conduct was instead consistent with an implied understanding that the former would not initially acquire but rather subsequently succeed to the latters' claim. "Where the creditor receives the money upon the understanding, express or implied, that the debt is to be assigned to the party paying, the debt survives, for the transaction is then treated as one of purchase, not payment." [52]

And concerning notes as negotiable instruments, several courts have indicated,

"Whether a transaction by which a negotiable instrument is taken up by one who is neither a party to the paper nor in any way bound for its payment constitutes a payment or a purchase is a question of intention—one of fact rather than of law—and must be settled by the evidence. It will ordinarily be considered a purchase in the absence of anything to show a contrary intention. A fortiori, if it appears that it was the intention to continue the existence of the note and not to cancel it, the transaction will be sustained as a purchase, at least where such intention is coupled with the power in the holder or in his representative to whom the judgment (instrument) is made to sell and transfer the instrument. Thus, money paid by a third person to the holder of a note under an agreement that the note shall be assigned to the one making the payment is not a payment on the note." [53]

 These sources are persuasive. The parties' intentions are controlling. However, the instruction given did not indicate such, but instead merely noted that the jury "may consider" the parties' intentions in forming the agreement. Accordingly, the jury did not have before it a complete and accurate statement of the law as a basis for its determination. The case must therefore be remanded for retrial on this sole issue.

Finally, given the jury's initial special verdict and the evidence presented, it appears that the court also erred in its construction of the verdict form on the "payment" issue. The jury was initially asked to determine Horman's relationship to Banberry and the Trust. In response, it found that while Horman was the alter ego of Banberry when the purchase agreement was made, he was not the alter ego of the Trust. However, the court thereafter asked, "In light of the court's instruction relating to the Purchase Agreement ... and 'payment' heretofore given to you, did the transfer of the $1.6 million to First Security ... constitute a 'payment' *from Banberry* ... to First Security ... of the trust deed notes?" (Emphasis added.) Not only is the jury's affirmative response to this question colored by the inadequate "payment" instruction given, but also its conclusion cannot be harmonized with the evidence and verdict. The verdict holds that Banberry paid the trust notes despite the pivotal evidence that the Trust had made the certificate transfer to First Security. Horman is the common factor between Banberry and the Trust; however, the jury specifically found that Horman was not the Trust's alter ego. Under the jury's verdict, then, the Trust and Banberry were independent entities, and the jury thus erred in concluding that *Banberry* paid the notes.

---

52. *Id.* at 195, 114 A.2d at 799–800.(citation omitted); *see also In re Bitker's Estate*, 251 Wis. 538, 545, 30 N.W.2d 449, 452 (1947) (guarantor purchased title and did not merely make payment extinguishing indebtedness); *Hutchings v. Sec. Exch. Corp.*, 287 Mich. 701, 706, 284 N.W. 614, 616 (1939) ("'Payment involves intent, express or implied, to make payment on the one side and to receive or accept it on the other.'" (quoting *Clayton County State Bank v. McMorrow*, 209 Iowa 165, 168, 225 N.W. 859, 860 (1929) (citations omitted))).

53. *Cason v. Cecil*, 194 La. 41, 53, 193 So. 362, 366 (1939) (quoting 8 Am.Jur. *Bills and Notes* § 830, at 478 (1937)); *accord Dixie Land Co. v. Blythe*, 227 La. 889, 892–93, 80 So.2d 853, 854 (1955); *see also* 10 C.J.S. *Bills and Notes* § 451, at 989–91 (where payment is made by maker with funds furnished by third person, intention of the parties governs the determination of whether the transaction is payment or purchase).

Furthermore, even if the jury had been properly instructed as to "payment" and had found that the Trust voluntarily paid Banberry's debt, such facts would not support the jury's explicit conclusion that Banberry *itself* paid the trust notes. Kimball contends that the verdict supports the conclusion that Horman was using the trust as a source of funds for Banberry such that Banberry effectively paid the First Security lien. Unfortunately, however, this speculative claim is not supported by the instructions given the jury or the special verdict. Accordingly, once the jury determined that Horman was not the alter ego of the Trust, the court should only have instructed the jury as to the issue of whether the note was voluntarily paid or whether it was purchased.

The judgment against Banberry and Horman is reversed, and the case is remanded for the sole determination of the lienholders' priorities after retrial of the "purchase" versus "payment" issue. In all other respects, the judgment is affirmed.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Associate Chief Justice (dissenting):

I dissent. I would affirm the judgment.

As to the fraud issue, I agree with the majority that perhaps, as a general rule, a mortgagor and a senior mortgagee owe no duty to a junior mortgagee to inform him that the senior mortgage has been paid. However, the payment which the jury found was made in the instant case was made during the course of this lawsuit in which one of the principal issues was the priority of the three trust deeds. The majority opinion does not discuss the duty issue in the context of an ongoing lawsuit where quite different rules apply to disclosure. Because of that failure, the majority errs in finding no duty on the part of First Security, Banberry, and Horman to disclose to Kimball the existence of the pertinent settlement agreement between the Horman Family Trust and First Security Bank which the jury found contained provision for payment of two trust deeds which were in competition with Kimball for first priority.

First Security brought this action to foreclose its two trust deeds that allegedly were senior to the purchase money trust deed held by Kimball. Kimball counterclaimed, alleging that his mortgage was senior. In light of Kimball's assertion of priority, First Security was defended by lawyers engaged by Commonwealth Title Insurance Co., which had insured one of the First Security trust deeds as a first lien on the land. Thus, the issue was clearly framed in the lawsuit: What was the priority of the three trust deeds? With this backdrop, while the lawsuit was pending, First Security and the Horman Family Trust entered into the October 1984 agreement, which ostensibly provides that the Trust purchase the two First Security trust deeds for $1.6 million. However, uncharacteristic of a purchase, First Security made no assignment of the note and trust deed to the purchaser; First Security was to continue pursuit of its foreclosure action. It was agreed that the agreement was to be kept confidential, and the Trust expressly assumed the risk that the agreement would become known to Kimball or Commonwealth. The parties seemed to contemplate that knowledge of the agreement by Kimball might bolster his claim that his trust deed was now elevated to first position and that knowledge by Commonwealth might give rise to a claim that it was exonerated from liability as insurer of a first lien.

In my opinion, a duty arose on the part of First Security, Horman, and Banberry to disclose to their adversaries and the trial court the existence of the agreement in the pending foreclosure action since the agreement potentially had an important bearing on the main issue, *viz.*, priority of the three mortgages. Banberry and Horman seek to justify their nondisclosure on the premise that since the parties to the settlement agreement did not intend "payment" of the

First Security trust deeds, but only "purchase" of them by the Horman Family Trust, the agreement had no impact on the issues of the foreclosure action and therefore did not need to be disclosed. This argument overlooks the reality that if the agreement provided for payment of the two First Security trust deeds, Kimball was elevated to first position and Commonwealth was exonerated. If it were only a purchase, then perhaps the foreclosure action should be continued by the new purchaser, the Horman Family Trust, as rule 17(a) of the Utah Rules of Civil Procedure requires actions to be prosecuted by the real party in interest. The fact that the jury found that the agreement provided for payment and thus elevated Kimball to first position amply demonstrates that the October 1984 agreement seriously impacted the issues of the pending action. The agreement should have been disclosed to all parties to the lawsuit and the trial court when it was made because it rendered moot a principal issue. We have long passed the era when a lawsuit was a "game of chance" and a party could win by skillfully withholding vital information from the court and adversaries.

I also dissent from the conclusion of the majority that the case must be remanded because of the error in instruction No. 15, wherein the jury was told that it "may" consider the intentions of the parties rather than that it "should" or "must" consider their intentions. While admittedly this is a technical error, in the context of this case I am unable to perceive how it could have been prejudicial to Banberry. The jury was never instructed that it could consider anything else in determining whether the payment of $1.6 million was a purchase or a payment. Instruction No. 15 defined "payment" and "purchase." It told the jury that the "intention of the parties should be determined from all of the facts surrounding the making of the agreement, and the manner in which the agreement was actually handled by the parties...." It further instructed the jury that it may consider the statements of the parties regarding their intent, but that the jury was not bound to determine intent on the basis of what the parties said their intent was. It was told to determine intent from all the evidence having a bearing on intent. Taking the instruction as a whole, as we must, the jury was fully informed that the parties' intent was the key to its determination of payment versus purchase.

The jury had before it the October 1984 written agreement, and it listened to days of testimony from many witnesses as to what the parties intended by that agreement. It then retired to determine whether the parties had effected a purchase or a payment. In making that determination, I cannot reasonably believe that it could have considered anything other than the intent of the parties as manifested by the written agreement and the testimony it had heard. The majority opinion does not suggest anything else the jury may have considered. No other instruction permitted it to do so. No other evidence was presented relating to the issue. It would be sheer speculation to conclude that because of this technical error in the use of "may," the jury was set on a course to disregard the evidence, both documentary and testimonial, that it had seen and heard in the courtroom.

It should be noted that even in *Ralph A. Badger & Co. v. Fidelity Building & Loan Association*, 94 Utah 97, 75 P.2d 669 (1938), which is relied upon by the majority for its position and is quoted in part in the majority opinion, we did not use the mandatory language the majority now insists upon. In *Ralph A. Badger* and the instant case, the majority relied upon language from 48 C.J. *Payment* § 1, at 586–87 (1929) (footnotes omitted): "Whether or not a transaction constitutes payment depends *largely* upon the intention of the parties...." (Italics added.) We have, on many occasions in deciding other cases, refused to find prejudicial error in instructions where the error was much more egregious than in the instant case. In those cases, we looked at the instruction as a

whole and relied upon Utah Rule of Civil Procedure 61, which forbids us from disturbing a judgment or order "unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Our cases place the burden on the appellant to demonstrate that the error was prejudicial to the extent that there is reasonable likelihood that in its absence there would have been a different result. *Harris v. Utah Transit Authority*, 671 P.2d 217, 222–23 (Utah 1983). No such demonstration has even been attempted in the instant case.

I also dissent from the majority's conclusion that the wording of the special verdict was prejudicial error. Again, the majority has exalted technical error above substance. While it is true that any payment which was made here with the $1.6 million was made by the Horman Trust, not by Banberry, the legal effect is the same irrespective of who made the payment. In other words, payment by Banberry had the same effect as payment by the Horman Trust as far as Kimball's rights are concerned. Payment by either elevated Kimball's mortgage into first position. Thus, in my judgment, any error in the verdict form was again harmless.